No. 14-35393

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

**MICROSOFT CORP.,**
Plaintiff-Appellee,

v.

**MOTOROLA, INC., MOTOROLA MOBILITY, INC., and GENERAL
INSTRUMENT CORPORATION**
Defendants-Appellants.

---

**On Appeal from the United States District Court
For the Western District of Washington, No. 2:10-cv-01823,
Hon. James L. Robart**

---

**BRIEF OF *AMICUS CURIAE* QUALCOMM INCORPORATED
IN SUPPORT OF NEITHER PARTY**

---

Richard S. Taffet
richard.taffet@bingham.com
Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022

Patrick Strawbridge
patrick.strawbridge@bingham.com
Bingham McCutchen LLP
One Federal Street
Boston, MA 02110

Stephanie Schuster
stephanie.schuster@bingham.com
Bingham McCutchen LLP
2020 K Street NW
Washington, DC 20006

*Attorneys for Amicus Curiae
Qualcomm Incorporated*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………..…………………....………ii

CORPORATE DISCLOSURE STATEMENT…………………………….……v

STATEMENT REQUIRED BY RULE 29(c)(5)………………………….…..v

INTEREST OF *AMICUS CURIAE*……………………………………....……1

SUMMARY OF THE ARGUMENT………………………………………5

ARGUMENT…………………………………………………………………....9

   I.  A RAND Commitment Is A Contract, The Meaning And Scope Of Which Must Be Determined Consistent With Established Contract Law….……….9

      A. Fundamental Rules Of Contract Construction Should Guide The Interpretation Of RAND Commitments…………………………….………9

      B. RAND Contracts Must Be Interpreted Based On The Terms Of The IPR Policies Under Which They Arise, And Not Based On Theoretical Or Policy Preferences………………………………………………….…..11

  II. The Flaws Of The District Court's Approach To Interpreting The RAND Contracts At Issue………………………………...…………………………17

      A. The District Court Ignored The Objective Of Ensuring Adequate Compensation For Innovators……………………………..…………18

      B. The District Court's Concerns About "Royalty Stacking" And "Hold-Up" Lacked Any Basis In Contract Or Evidence……………………………19

         1. Purely theoretical concerns about royalty stacking do not properly inform the interpretation of RAND terms…………………………...19

         2. Using theoretical concerns about "hold-up" to inform the interpretation of RAND terms was likewise misdirected…....………24

      C. The Deviation From Established Principles Of Contract Interpretation Led The District Court To Apply Additional Unsound Valuation Limitations……………………………………………………...…27

         1. The RAND contract provides no basis for the use of an *ex ante* incremental value analysis for SEPs………………………..27

         2. The RAND contract does not support an arbitrary evaluation of a patent's value to a standard, in addition to the consideration of a patent's use in the infringing product………………………………29

CONCLUSION………………………………………………………..30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Apple Inc. v. Motorola, Inc.*,
    757 F.3d 1286 (Fed. Cir. 2014)……………………………………………16

*Apple, Inc. v. Motorola Mobility, Inc.*,
    886 F. Supp. 2d 1061 (W.D. Wis. 2012)……………………………………9

*Baldwin v. Trailer Inns, Inc.*,
    266 F.3d 1104 (9th Cir. 2001)…………………………...……………………..9

*Blue Mountain Mem'l Gardens v. Dep't of Licensing Cemetery Bd.*,
    971 P.2d 75 (Wash. Ct. App. 1999)……………………………………..10

*Bort v. Parker*,
    42 P.3d 980 (Wash. Ct. App. 2002) ………………………...………………9

*Brogan & Anensen LLC v. Lamphiaer*,
    202 P.3d 960 (Wash. 2009)…………………………………………...……11

*Commonw. Sci. & Indus. Res. Org. v. Cisco Sys.*,
    No. 6:11-cv-343, 2014 WL 3805817 (E.D. Tex. July 23, 2014)……………7

*Ericsson Inc. v. D-Link Sys., Inc.*,
    No. 6:10-cv-473, 2013 WL 4046225 (E.D. Tex. Aug. 6, 2013)……..……7, 22

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
    535 U.S. 722 (2002)………………………………………………………..17

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
    318 F. Supp. 1116 (S.D.N.Y. 1970)……………………………....15, 23

*Hearst Commc'ns v. Seattle Times Co.*,
    115 P.3d 262 (Wash. 2005)…………………………………...……11

*Hollis v. Garwall*,
    974 P.2d 836 (Wash. 1999)……………………………………..…..21

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012)…………………………………...…22, 19

*Lillywhite v. Piha*,
    134 Wash. App. 1009 (2006)………………………………….…..11, 19

*Mars, Inc. v. Coin Acceptors, Inc.*,
    527 F.3d 1359 (Fed. Cir. 2008)…………………………………….29

*McCormick v. Dunne & Black, P.S.*,
    167 P.3d 610 (Wash. Ct. App. 2007)………………………………....10

*McKeever v. United States*,
    14 Ct. Cl. 396 (1878)…………………………………………….…15

*Medtronic, Inc. v. White*,
    526 F.3d 487 (9th Cir. 2008)…………………………………….....14

*Microsoft Corp. v. Motorola, Inc.*,
    864 F. Supp. 2d 1023 (W.D. Wash. 2012)……………………….…9

*Newport Yacht Basin Ass'n v. Supreme Nw., Inc.*,
    285 P.3d 70 (Wash. Ct. App. 2012)………………………….……..10

*Orange Belt Dist. Council of Painters v. W. E. Stubblefield & Sons*,
    437 F.2d 754 (9th Cir. 1971)………………………………………..11

*Paltex Corp. v. Mossinghoff*,
    758 F.2d 594 (Fed. Cir. 1985)…………………………………...…….14

*Potts v. Coe*,
    145 F.2d 27 (D.C. Cir. 1944)………………………………………..28

*Pub. Emps. Mut. Ins. v. Sellen Constr.*,
    740 P.2d 913 (Wash. Ct. App. 1987)………………………………..10

*Scribner v. Worldcom, Inc.*,
    249 F.3d 902, 908 (9th Cir. 2001)…………………………….……..10

- iii -

*Synopsis, Inc. v. Magma Design Automation, Inc.*,
    No. C-04-3923, 2007 WL 322353 (N.D. Cal. Jan. 31, 2007)……………...14

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011)……………………………………….……15

*Wordtech Sys. Inc v. Integrated Networks Solutions, Inc.*,
    609 F.3d 1308 (Fed. Cir. 2010)………………………………….....16, 22

*W. Plaza, LLC v. Tison*,
    322 P.3d 1 (Wash. Ct. App. 2014)…………………………………...…9, 21

## STATUTE & TREATISES

35 U.S.C. § 284…………………………………...……………………………14

RESTATEMENT (SECOND) OF CONTRACTS § 202(1) (1981)……………………..…10

11 WILLISTON ON CONTRACTS § 32:2 (4th ed.)……………………….……………..10

## OTHER AUTHORITIES

*Balancing Innovation & Intellectual Property Rights In a Standards-Setting Context*, ITU NEWS No. 9 (2012)……………………………………………13

*In re Certain Wireless Devices with 3G and/or 4G Capabilities & Components Thereof,* Inv. No. 337-TA-868 (I.T.C. June 13, 2014)…………………….…25, 26

Maureen K. Ohlhausen, *Antitrust Enforcement In China – What Next?* (Sept. 16, 2014)………...............................................................................……7

Roger G. Brooks, *Patent "Hold-Up," Standards-Setting Organizations & the FTC's Campaign Against Innovators*, 39 AIPLA Q.J. 435 (Fall 2011)……..……26

Roger G. Brooks & Damien Geradin, *Interpreting & Enforcing the Voluntary FRAND Commitment*, 9 INT'L J. OF IT STANDARDS & STANDARDIZATION RES. 1 (2011)………………………………………………………………..…21

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Qualcomm Incorporated does not have any parent corporations, and no publicly held corporation owns 10% or more of its stock.

## <u>STATEMENT REQUIRED BY RULE 29(c)(5)</u><br><u>OF THE FEDERAL RULES OF APPELLATE PROCEDURE</u>

No party's counsel authored this brief in whole or in part.  No party, a party's counsel, or other person (other than *amicus curiae* Qualcomm Incorporated) contributed money that was intended to fund preparation or submission of this brief.

## INTEREST OF *AMICUS CURIAE*

Qualcomm Incorporated submits this *amicus curiae* brief because of its critical interest in the development of the law for the valuation of standards-essential patents ("SEPs") subject to "RAND" ("reasonable and nondiscriminatory") licensing commitments. Qualcomm owns a substantial portfolio of SEPs that it licenses extensively to third parties, and it is alarmed by the adoption of legal rules that ignore accepted principles of contract construction in favor of newly-minted theories designed to devalue SEPs. These theories seek to achieve short-term gains for implementers, at the expense of longer-term gains that depend upon appropriate incentives to spur investment in risky research and development necessary to drive innovation.[1]

Qualcomm is a leading innovator in the cellular communications industry, which has prospered in reliance on the voluntary RAND commitments made by innovators to SSOs. Qualcomm pioneered the use of code division multiple access ("CDMA") technology for the transmission of cellular communications. CDMA came to be the basis of all "3G" cellular standards. Through RAND licensing, Qualcomm has made its 3G innovations widely available in return for royalties and other consideration from its licensees. Qualcomm has in turn reinvested billions of dollars of this licensing revenue to research and invent better technologies. As a

---

[1] All parties consent to Qualcomm's filing of this brief.

result, Qualcomm has also been a principal developer of the "4G" technology that forms the basis for the long term evolution ("LTE") standards now being deployed worldwide.

As the pioneer of CDMA and an extensive contributor to LTE, Qualcomm has developed an industry-leading portfolio of technologies that are protected by both SEPs and non-essential patents, consisting of approximately 36,000 patents worldwide, with some 50,000 patent applications pending. This portfolio represents decades of R&D, and Qualcomm invests roughly 20 percent of its annual revenues in R&D (amounting last year to approximately $5 billion).

While investing billions of dollars in developing technology that contributed to the success of 2G, 3G, and 4G cellular systems worldwide, Qualcomm contributed its intellectual property ("IP") to standards through RAND commitments, relying heavily on the stability of the mutual contractual promises associated with voluntary RAND licensing. Qualcomm has licensed its portfolio to essentially all major handset manufacturers worldwide; it now has more than 260 3G licensees and more than 90 4G licensees.

Throughout these endeavors, Qualcomm was a risk-taker. Qualcomm risked its future on the superiority of CDMA when industry experts scoffed at the idea. Qualcomm ventured early into 4G research. And today, Qualcomm is researching next-generation cellular technologies. Licensing fees and royalties account for

approximately 30 percent of Qualcomm's revenues. Without those revenues, Qualcomm could not have made, or continue to make, the risky investments in R&D at the levels needed to develop next-generation cellular technologies.

Qualcomm is not only a research and licensing company. It is also the world's leading supplier of the wireless communications chips that are the heart of a mobile phone. As a large technology product company, Qualcomm obtains licenses from others in the industry. Qualcomm's dual position as a major licensor and major licensee gives it an unusual and balanced view into the operation of RAND commitments and licensing within standards-dependent industries.

In addition, Qualcomm has been an active participant in numerous SSOs, including the Institute of Electrical and Electronics Engineers ("IEEE") and the International Telecommunications Union ("ITU"), which are relevant to this case. Qualcomm regularly participates in SSO deliberations regarding RAND licensing commitments. Based on the promise of adequate compensation, Qualcomm has made hundreds of voluntary commitments to various SSOs to subject its patented inventions to RAND obligations—including SEPs covering immensely valuable inventions that make possible faster wireless data-transfer, greater network-capacity, lower power-consumption in mobile devices, better cellular coverage, and more.

Qualcomm—along with the cellular industry worldwide—has experienced

- 3 -

extraordinary growth over the last two decades under existing SSO policies and their balanced approach to RAND licensing. As both a driver and a beneficiary of the investment, innovation, and rapid uptake of technology by consumers, Qualcomm has an acute interest in ensuring the continuation of such growth based on the accurate understanding and enforcement of RAND licensing obligations. For this reason, Qualcomm is very concerned that, despite the remarkable success of the standardized cellular industry at all levels of the value chain, SEPs and RAND licensing have recently become subjects of intense controversy. Partisan advocates mix alarmist warnings with favored policy prescriptions unmoored from the terms of any SSO policy, RAND commitment, or the intent of the innovator who made such a commitment. The chorus is focused on lowering returns to innovators while decreasing costs for implementers. Qualcomm is concerned that courts, like the District Court here, can unwisely lose sight of the need to rigorously balance the interests of both innovator and implementer. This would radically change a wildly successful standardization regime and stifle incentives for innovation.

## SUMMARY OF THE ARGUMENT

This case involves the valuation of two portfolios of SEPs subject to RAND commitments.  Accepted principles of contract construction require the valuation of SEPs to be no different from other patents.  There is no dispute that RAND commitments made by SEP owners (such as Motorola) to SSOs (such as IEEE or ITU) are contracts.  Like any contract, the RAND commitment must be interpreted using established principles of contract construction.  Courts may not rewrite the RAND contract, but instead must seek and apply the parties' expectations at the time the contract was made, guided foremost by the documents comprising the RAND commitments and the relevant IPR policies.  The District Court, however, ignored these well-established principles in interpreting the RAND commitments in this case, and thus developed an improper SEP valuation methodology.

The IPR policies in this case require RAND terms to advance two equally important goals: (i) allowing SEP owners to receive adequate compensation for their SEPs; and (ii) providing implementers access to SEPs included in standards. Implementing both goals is paramount to maintaining a successful RAND licensing regime.  The first goal incentivizes innovators to engage in risky R&D and then contribute any resulting inventions to the standards process; the second goal ensures that implementers gain access to essential patents.

The District Court's analysis did not accurately describe or properly balance

these two objectives.  Instead, it focused almost exclusively on the single goal of what it described as facilitating "widespread adoption" of standards.  This not only misstates one of the IPR policies' goals—providing standard implementers with *access* to SEPs—but also ignores the equally important "adequate compensation" goal altogether.  Driven by this one-sided view, the District Court improperly modified the *Georgia-Pacific* analysis—often used in patent cases to determine reasonable royalties under 35 U.S.C. § 284—to disconnect its determination of a RAND royalty from the specific contracts at issue and the patent law principles they incorporate.

Further skewing its analysis, the Court gave near dispositive weight in interpreting the RAND commitments to theoretical risks of "royalty stacking" and patent "hold-up."  This approach, however, was consistent with neither the RAND commitments nor the evidence presented below, and instead unfairly placed a thumb on the scale in favor of the implementer (and against the innovator).  This is inconsistent with decisions by other courts that have adopted a more neutral analytical framework.  Notably, another court has twice taken the proper approach (consistent with accepted contract and patent principles) to resolving RAND disputes, rejecting proposals to modify the *Georgia-Pacific* factors based on speculative risks of royalty stacking and hold-up, where there was no evidence that

these risks had materialized.[2]

Qualcomm does not challenge the District Court's findings on the contributions of the patents and products at issue, and thus the actual rates and ranges it established. Those findings may suggest that the patents at issue had little or no value under any measure. But the manifest errors of the District Court in interpreting RAND commitments and devising its methodology, *if applied in other cases involving different SEPs and different products*, will cause incalculable damage to innovation incentives and standards going forward. It would necessarily devalue all SEPs, regardless of the actual value each contributes to the success of standardized products, and could form the basis for industrial policies that inhibit incentives to innovate and develop successful standards activities.[3]

---

[2] *See, e.g.*, *Ericsson Inc. v. D-Link Sys., Inc.*, No. 6:10-cv-473, 2013 WL 4046225, at *18 (E.D. Tex. Aug. 6, 2013) (declining to instruct jury on alleged effects of royalty stacking in calculating royalty) (appeal pending); *Commonw. Sci. & Indus. Res. Org. v. Cisco Sys.*, No. 6:11-cv-343, 2014 WL 3805817, at *12 (E.D. Tex. July 23, 2014) (noting that "specific adjustments to the [*Georgia-Pacific*] framework are not necessary here").

[3] Indeed, these proceedings are being closely watched in countries such as China, which has industrial policies designed to undermine the value of patented technology. *See, e.g.*, Maureen K. Ohlhausen, *Antitrust Enforcement In China – What Next?*, at 2–3 (Sept. 16, 2014) (describing how "China appears to be rebalancing the value of intellectual property to favor short term efficiency gains over longer term dynamic efficiency gains that come from strong protection of those rights"), *available at* http://www.ftc.gov/public-statements/2014/09/antitrust-enforcement-china-what-next-second-annual-gcr-live-conference.

Such a result would be unwarranted. The standards at issue in this case have been wildly successful, and this particular dispute should not overshadow the hundreds, if not thousands, of existing bilateral RAND licenses, which have allowed the standards to flourish. Indeed, products incorporating these standards are ubiquitous (routers, smartphones, printers, gaming devices, etc.), proving that the existing, balanced RAND licensing regime works well.

That is why it is imperative that the Court identify those errors and either reverse the District Court or, should it affirm the decision, state expressly that it is limited strictly to its facts. Doing so is vital to ensure faithful interpretation of the contractual RAND commitments of SEP owners, and maintain a RAND environment that has allowed both innovation and adoption to flourish.

## **ARGUMENT**

**I.    A RAND COMMITMENT IS A CONTRACT, THE MEANING AND SCOPE OF WHICH MUST BE DETERMINED CONSISTENT WITH ESTABLISHED CONTRACT LAW.**

A RAND commitment is "a contract … formed through … any essential patent holder's[] commitment to the [SSO] to license patents on RAND terms." *Microsoft Corp. v. Motorola, Inc.*, 864 F. Supp. 2d 1023, 1031 (W.D. Wash. 2012). Potential licensees may enforce the RAND commitment as intended third-party beneficiaries.  *E.g.*, *Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1085 (W.D. Wis. 2012).

Because a RAND commitment is a contract, its terms must be interpreted under traditional principles of contract law.  These familiar principles are the starting point for any analysis of the District Court's ruling.

### **A.    Fundamental Rules Of Contract Construction Should Guide The Interpretation Of RAND Commitments.**

"The touchstone of contract interpretation is the parties' intent."  *Bort v. Parker*, 42 P.3d 980, 987 (Wash. Ct. App. 2002).  Thus, interpreting what constitutes RAND royalties for a particular SEP must "give effect" to the mutual intent of the parties at the time they formed their agreement.  *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1118 (9th Cir. 2001) (applying Washington law).

The best evidence of the parties' intent is the language of the agreement. *See W. Plaza, LLC v. Tison*, 322 P.3d 1, 3 (Wash. Ct. App. 2014) ("In construing a

contract, we give the parties' intent as expressed in the instrument's plain language controlling weight …."). Terms generally bear "their ordinary meaning unless otherwise defined by the parties or by the dictates of the context." *Scribner v. Worldcom, Inc.*, 249 F.3d 902, 908 (9th Cir. 2001). "[A] term of art in a given field is given its technical meaning when used in an agreement within that field." *Blue Mountain Mem'l Gardens v. Dep't of Licensing Cemetery Bd.*, 971 P.2d 75, 77 (Wash. Ct. App. 1999). A court "cannot ignore the language agreed upon by the parties …." *Pub. Emps. Mut. Ins. v. Sellen Constr.*, 740 P.2d 913, 915 (Wash. Ct. App. 1987). "[C]ourts do not have the power, under the guise of interpretation, to rewrite contracts the parties have deliberately made for themselves." *McCormick v. Dunne & Black, P.S.*, 167 P.3d 610, 619 (Wash. Ct. App. 2007); *see* 11 WILLISTON ON CONTRACTS § 32:2 (4th ed.) ("[Courts] can only enforce the contract to which the parties themselves have agreed.").

Moreover, a "fundamental rule[] of contract interpretation" is that "the meaning afforded the provision and the whole contract must be reasonable and consistent with the purpose of the overall undertaking." *Newport Yacht Basin Ass'n v. Supreme Nw., Inc.*, 285 P.3d 70, 79 (Wash. Ct. App. 2012). In other words, "if the principal purpose of the parties is ascertainable it is given great weight." RESTATEMENT (SECOND) OF CONTRACTS § 202(1) (1981).

While a court may consider extrinsic evidence to help "interpret a contract

term and determine the contracting parties' intent," only "objective manifestations" of the parties' intent—*i.e.* evidence—may inform contract interpretation.  *Brogan & Anensen LLC v. Lamphiaer*, 202 P.3d 960, 961–62 (Wash. 2009).  Unproven theories and speculation must be disregarded.  *See Lillywhite v. Piha*, 134 Wash. App. 1009, 1009 (2006).  And in all instances, "generalized public policy concerns cannot be used to rewrite a clear and lawful contract."  *Hearst Commc'ns v. Seattle Times Co.*, 115 P.3d 262, 271 (Wash. 2005); *accord Orange Belt Dist. Council of Painters v. W. E. Stubblefield & Sons*, 437 F.2d 754, 756 (9th Cir. 1971).

**B.    RAND Contracts Must Be Interpreted Based On The Terms Of The IPR Policies Under Which They Arise, And Not Based On Theoretical Concerns Or Policy Preferences.**

Consistent with the foregoing, the meaning of the RAND contracts at issue must be ascertained by first examining their sources—the IEEE and ITU IPR policies—and then by considering available evidence regarding their underlying purposes and the expectations of the parties.  Any other approach would frustrate, rather than implement, the contracting parties' intent.

The IEEE and ITU IPR policies set forth the relevant RAND commitments:

- "[A] license for compliant implementation of the standard will be made available … under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination."  IEEE-SA Standards Bd. Bylaws ("IEEE IPR Policy") § 6.2.

- 11 -

- "The patent holder is willing to negotiate licenses … on a non-discriminatory basis on reasonable terms and conditions."  Common Patent Policy for ITU-T/ITU-R/ISO/IEC ("ITU IPR Policy") § 2.2.

The IPR policies intentionally do not define specific RAND rates or terms for a particular license.  IEEE IPR Policy § 6.2 ("IEEE is not responsible … for determining whether any licensing terms or conditions … are reasonable or non-discriminatory").  Instead, RAND terms "are left to the parties concerned," ITU IPR Policy § 2.2, unconstrained by any particular methodology.

The IEEE and ITU also have emphasized that RAND commitments are intended to accommodate the interests of ***both*** innovators and implementers by advancing two equally important goals: (1) providing SEP owners with continuing incentives to undertake the substantial risks and expense required for the discovery and development of technologies, and to contribute such technologies to the standardization process; and (2) ensuring that implementers of a standard have access to essential patents.  Specifically, the ITU has stated that its IPR policy is intended to "strike a working balance between the interests of SEP owners and implementers … by ensuring that owners of intellectual property will be motivated to contribute their patented technologies to the standards-development process and that the standards incorporating these technologies will remain widely available to

implementers."[4]  Similarly, IEEE amended its IPR policy in 2007 to "[e]nsure a fair and balanced environment for all participants."  Presentation, *IEEE Standards Ass'n Patent Policy* (July 2008).[5]

Implementing this balance is essential for developing successful standards. Standard-setting is a voluntary, consensus-driven process that seeks to develop superior technical specifications.  To generate maximum benefits to industry and consumers, standards often require use of patented technologies.  Therefore, there must be incentives not only for the discovery and development of such technologies, but for their voluntary contribution to standard-setting efforts. Absent these incentives, innovators may choose to sit on the sidelines rather than invest in risky R&D.  Or they may withhold their (potentially superior) technologies from the standards process altogether—because of inadequate compensation—putting the standard-setting process at risk of delivering standards that offer inferior technical performance, higher rates of obsolescence, and greater

---

[4] *Balancing Innovation & Intellectual Property Rights In a Standards-Setting Context*, ITU NEWS No. 9 (2012), *available at* https://itunews.itu.int/en; *see also* ITU IPR Policy ("[A] patent embodied fully or partly in a [standard] must be accessible to everybody without undue constraints."); IEEE IPR Policy § 6.2(b) (providing process making SEPs "available to an unrestricted number of applicants on a worldwide basis").

[5] *Available at* http://www.itu.int/dms_pub/itu-t/oth/06/14/T06140000030002 PDFE.pdf.  Other IPR policies likewise emphasize this balance.  *E.g.*, ETSI IPR Policy § 3.1 ("[T]he ETSI IPR POLICY seeks a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of IPRs.").

costs of implementation.

Moreover, a proper construction of a RAND contract that respects the parties' expectations must be informed by applicable patent law. When contracts (like those at issue here) employ terms "that reflect well settled principles of patent … law"—such as "reasonable royalties"[6]—"the pertinent language of the contract[s] indicates convincingly that the parties intended for patent law to apply in interpreting the … Agreement[s]." *Medtronic, Inc. v. White*, 526 F.3d 487, 496–97 (9th Cir. 2008); *see Synopsis, Inc. v. Magma Design Automation, Inc.*, No. C-04-3923, 2007 WL 322353, at *24 (N.D. Cal. Jan. 31, 2007) ("[T]erms common to patent law and used in the [contract], such as 'invention,' … were to be understood in accordance with their meaning under patent law."). That is especially so where, as here, there is no evidence in the record that the parties to the RAND contract intended otherwise.

Accordingly, in determining the "reasonableness" of RAND royalties, courts should look to well-established patent damages principles for determining a "reasonable" royalty. This includes the patentee's fundamental expectation that the investments and risks essential to invention will be rewarded. *See Paltex Corp. v. Mossinghoff*, 758 F.2d 594, 600 (Fed. Cir. 1985) ("[T]he encouragement of

---

[6] Upon a finding of infringement, courts must award a patentee no less than a "reasonable royalty" to compensate for the use made of the invention by the infringer. 35 U.S.C. § 284.

- 14 -

investment-based risk is the fundamental purpose of the patent grant ….").
Nothing in the IEEE or ITU IPR policies reflects any intention to depart from such
principles, which for at least 135 years have provided an unbiased approach that
does not tip the analysis toward either infringer or innovator.[7] And, to determine
RAND royalties differently by imposing implementer concerns that are not found
in the relevant IPR policies, would improperly rewrite the RAND commitment and
inject bias in favor of one side of the negotiation.

To determine reasonable royalties in patent disputes, courts have looked to
the factors set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp.
1116, 1120 (S.D.N.Y. 1970). The *Georgia-Pacific* factors "tie the reasonable
royalty calculation to the facts of the hypothetical negotiation at issue," *Uniloc
USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011), and they
can—without substantial alteration—accommodate the non-biased RAND analysis
necessary to safeguard the interests of both innovators and implementers, including
by hypothesizing the flexible bilateral negotiations envisioned by the RAND

---

[7] *See, e.g.*, *McKeever v. United States*, 14 Ct. Cl. 396, 425 (1878) (setting
patent damages as "the fair and reasonable value of a license" based upon "such a
royalty as it may reasonably be presumed the defendants would have been willing
to pay and the claimant to accept if the matter at the outset had gone to an express
agreement").

contract.[8]  Proper application of the *Georgia-Pacific* factors ensures that each party is put to its respective proof, and that the analysis does not "bake in" a bias that favors one party over the other.  This approach is consistent with the Federal Circuit's recent decision rejecting arguments that RAND-committed patents should be treated differently when evaluating the other major patent remedy—injunctions. *See Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1331–32 (Fed. Cir. 2014) (rejecting the departure from established legal principles because of the existence of a RAND commitment).

This non-biased, flexible approach has allowed for the enormous success of RAND licensing to date.  While much has been written about this case and similar litigation in the "smartphone" wars, licensing disputes over SEPs are rare.  The phenomenal success of the WiFi standard at issue here, and the 3G and 4G cellular technology developed and deployed by Qualcomm, under the current regime refutes any claim that RAND agreements need to be radically altered.  For every litigation involving an SEP-licensing issue, hundreds (if not thousands) of licenses have been successfully negotiated—a fact too often forgotten in RAND debates.

---

[8]  Although the *Georgia-Pacific* analysis is useful when determining a reasonable royalty in this context, it is not the only method for doing so.  *See Wordtech Sys., Inc v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1319 (Fed. Cir. 2010) ("A reasonable royalty can be calculated from an established royalty, the infringer's profit projections for infringing sales, or a hypothetical negotiation between the patentee and infringer based on the factors in *Georgia-Pacific* ….").

This success counsels caution, lest activism fundamentally disrupts a system that has functioned well beyond any objective expectations to deliver ever-better technologies and products to consumers.    Indeed, the Supreme Court has emphasized the need for great caution "before adopting changes that disrupt the settled expectations of the inventing community."    *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 739 (2002).

## II.    THE FLAWS OF THE DISTRICT COURT'S APPROACH TO INTERPRETING THE RAND CONTRACTS AT ISSUE.

The District Court's failure to properly construe Motorola's RAND commitments resulted in "modifications" of the *Georgia-Pacific* factors that departed from the balanced approach that is required by the RAND contract and patent law.    The resulting methodology, if applied more broadly to all RAND-committed patents, will run a great risk of substantially undervaluing SEPs, radically realigning the proper royalty analysis, and disregarding the incentives for innovation that motivate patentees to discover and develop patented technology and contribute it to the standards process—all in violation of RAND commitments and the intent of the parties thereto.    Specifically, the District Court (a) failed to explain how its interpretation of RAND commitments satisfied the objective of "adequate compensation" and preserved the incentive for investment in costly R&D of technologies most useful in standards; (b) improperly relied upon theoretical and speculative concerns, nowhere mentioned in the relevant RAND

policies and commitments, of potential "royalty stacking" and "hold-up" to justify the subordination of adequate compensation and the incentives they are designed to preserve; and (c) imposed arbitrary limitations on the value of SEPs that have no basis in the RAND contracts and further depart from the accepted, balanced approach for determining the reasonable value of patents.

### A. The District Court Ignored The Objective Of Ensuring Adequate Compensation For Innovators.

Throughout its analysis, the District Court wrongly emphasized that the "central principle" of a RAND commitment is the widespread adoption of a standard. *E.g.*, *Microsoft Corp. v. Motorola, Inc.*, No. C10-1823, 2013 WL 2111217, at ¶ 456. The District Court used this to justify numerous limitations and downward revisions during its RAND royalty analysis. *See id.* ¶¶ 55, 70, 110, 459–60, 509–10, 526 n.23, 558 (invoking "widespread adoption" as the purpose of the RAND commitment). But the RAND policies at issue in this case are designed to balance two principles, "adequate compensation" for SEP owners and "access" to SEPs. *See supra*, pp. 12–13. Neither principal is made any more "central" or important than the other. By ignoring one of these goals (adequate compensation), and misstating the other ("widespread adoption" of the standard rather than "access" to SEPs), the District Court rewrote the balanced RAND commitment from a right to access on reasonable terms into a one-sided directive that advances only implementers' interests in obtaining licenses at the lowest possible cost. This

substitution of policy preferences of a court or economists for the intent of the parties is impermissible. *See Lillywhite*, 134 Wash. App. at 1009. Indeed, the pursuit of "widespread adoption" at the expense of any other interest will necessarily drive licensing costs toward zero, as *any* licensing cost will represent a hurdle to the uptake of a standard. But zero return equals zero incentive to innovate, and there is no basis in contract or patent law for placing the success of a standard on the backs of patentees alone. To the contrary, the SSOs sought balance in crafting their IPR policies. The District Court's fixation on widespread adoption fundamentally misstated the bargain struck by the RAND commitment, and this error permeated the remainder of its analysis.

### B.    The District Court's Concerns About "Royalty Stacking" And "Hold-Up" Lacked Any Basis In Contract Or Evidence.

The District Court also grounded its unbalanced modification of the *Georgia-Pacific* factors in a misplaced reliance about purely theoretical risks of royalty stacking and hold-up. The overarching weight given to these concerns by the District Court cannot be squared with the IEEE or ITU IPR policies or proper application of patent law principles.

#### 1.    Purely theoretical concerns about royalty stacking do not properly inform the interpretation of RAND terms.

Concerned about the theoretical possibility of "payment of excessive royalties to many different holders of SEPs," the District Court concluded that "a

- 19 -

proper methodology for determining a RAND royalty should address the risk of royalty stacking by considering the aggregate royalties that *would* apply *if* other SEP holders made royalty demands of the implementer." *Microsoft*, 2013 WL 2111217, at ¶¶ 65–66 (emphases added). Elevating this hypothetical concern to fact, the District Court adjusted certain *Georgia-Pacific* factors to cap the potential royalty based on a mathematical comparison of the patents declared by that patent owner as potentially essential, to the aggregate of all other potentially essential patents for which a royalty could be charged, even if no royalties were being charged or the asserted patents were in fact not essential.[9] *Id.* ¶¶ 539–46. The District Court did this despite uncontroverted trial testimony that there was no factual evidence supporting the existence of any actual stacking in this case.[10] Relying instead on the general opinions of litigation experts, the District Court asserted that any "royalty rate that implicates such clear stacking concerns … does not stand up to the central principle of the RAND commitment—widespread adoption of the standard." *Id.* ¶ 456.

---

[9] The District Court adjusted factor 15 (the amount the licensee and licensor would have agreed upon at the time infringement began), and cited RAND's "anti-stacking principle" to limit the upper bound of the RAND ranges for the patents in question. *Microsoft*, 2013 WL 2111217, at ¶¶ 538–39, 586, 605, 622.

[10] *See* Nov. 13, 2012 Tr. 178:21–24 (Murphy) (admitting that "the evidence [he] ha[s] seen" shows that no stacking with the 802.11 standard); Nov. 16, 2012 Tr. 140:15–19 (Lynde) (same); Nov. 13, 2012 Tr. 179:9–14 (Murphy) (admitting that there is no evidence of stacking for the H.264 standard); Nov. 16, 2012 Tr. 140:23–141:2 (Lynde) (same).

This approach cannot be squared with a proper construction of a RAND commitment under contract law, and improperly elevates speculation above actual proof.

*First*, neither the RAND commitments nor the underlying IPR policies refer to any royalty-stacking principle, much less require it to be central to the analysis. If the SSOs and their members—SEP owners and implementers—had intended that royalties for all SEPs be contractually limited by the potential aggregate royalties demanded of implementers, they could have said so. *See W. Plaza*, 322 P.3d at 3 ("[T]he parties' intent *as expressed in the instrument's plain language* [is] controlling ….") (emphasis added). While the District Court relied in part on comments Motorola submitted to an unrelated standards body (ETSI), *Microsoft*, 2013 WL 2111117, at ¶¶ 67–69, this was wholly unjustified and does not demonstrate the mutual, objective intent of the parties arising under IEEE and ITU IPR policies at issue. *See Hollis v. Garwall*, 974 P.2d 836, 843 (Wash. 1999) (holding "[e]vidence of a party's unilateral or subjective intent" is irrelevant to the parties' objective mutual intent). Moreover, ETSI specifically *rejected* efforts to add royalty-stacking language into its IPR policy precisely because it would overturn the required balance of interests. Roger G. Brooks & Damien Geradin, *Interpreting & Enforcing the Voluntary FRAND Commitment*, 9 INT'L J. OF IT STANDARDS & STANDARDIZATION RES. 1, 20–21 (2011) (recounting unsuccessful

attempt to amend ETSI's IPR Policy to account for stacking).

*Second*, the District Court's modification of the royalty analysis to account for the mere *possibility* of royalty stacking departed from the parties' expectation that a negotiated RAND royalty would be based upon evidence, not "speculation or guesswork." *Wordtech*, 609 F.3d at 1322 (quoting *Del Monte Dunes v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir.1996)); *accord LaserDynamics, Inc. v. Quanta Computer, Inc*., 694 F.3d 51, 67 (Fed. Cir. 2012) (noting that royalty calculations "must be based on sound economic and factual predicates").

*Third*, the treatment below of royalty stacking stands in marked contrast to the sound approach taken in *Ericsson*, which involved patents essential to the 802.11 standard. Unlike the District Court below, the *Ericsson* court rejected arguments that theoretical royalty stacking must drive the determination of RAND royalties in every case as a matter of law. Because the accused infringer in *Ericsson* provided no evidence of actual royalty stacking, the court refused to adjust its methodology for calculating a reasonable royalty to account for unproven stacking concerns. 2013 WL 4046225, at *18 ("The best word to describe the … royalty stacking argument is theoretical."). By requiring factual evidence, rather than theory and speculation, the *Ericsson* court properly implemented the expectations of the parties to the RAND contract and their objective understanding of patent law's refusal to consider speculative evidence in calculating a

"reasonable" royalty.  And if actual evidence of royalty stacking materialized in a given case (unlike this one), the existing, unmodified *Georgia-Pacific* analysis already permits courts to account for "the established profitability of the product made under the patent" (factor 8) and "the portion of the profit or of the selling price that may be customary in the particular business or in a comparable business to allow for the use of the invention or analogous inventions" (factor 12). *Georgia-Pacific*, 318 F. Supp. at 1120.  Modification was thus unnecessary; any actual facts showing royalty stacking already would be considered.

*Finally*, attempting to rewrite a RAND commitment to include a royalty-stacking calculation is economically illogical.  The proposed analysis presupposes that there is some fixed share of the product price that can properly be charged for necessary IPR, and thus that the more patents a product practices, the less each patent should be valued, regardless of the varied importance of the patented technologies.  But patented technology is no different from any other product; adding a second feature does not lessen the value contributed by the first.  Adding leather upholstery to a car does not reduce the value (or the cost) of the engine.  Similarly, one patent cannot, nor should not, reduce the value contribution of another.  An approach that necessarily minimizes the value of the specific contribution cannot be correct, much less be superimposed on an SEP owner's commitment to offer a "reasonable" royalty.

### 2. Using theoretical concerns about "hold-up" to inform the interpretation of RAND terms was likewise misdirected.

The District Court also expressed great concern about the potential for patent "hold-up," which it characterized as the "ability of a holder of an SEP to demand more than the value of the patented technology and to attempt to capture the value of the standard itself …."  *Microsoft*, 2013 WL 2111217, at ¶ 55.  The District Court stated that hold-up "can threaten the diffusion of valuable standards and undermine the standard-setting process," *id.* ¶ 57, and it ultimately modified *Georgia-Pacific* factors 6, 8, 10, and 13 to account for the potential of hold-up, *id.* ¶¶ 103, 107, 109.

This approach again ignored the evidentiary record and raises several interrelated questions about the value of a patent and the meaning of hold-up.  As a preliminary matter, there is no mention of hold-up in the RAND policies, including those at issue here.  The issue in any RAND case is whether the terms under consideration are reasonable.[11]  More fundamentally, references to concerns about hold-up cannot supply what is lacking from the language and purposes of the RAND policies before the Court: evidence that the parties to RAND commitments understood or should reasonably have understood that fees above those derived by

---

[11] This is unsurprising given the language of the RAND commitment and the established patent law governing the determination of a reasonable royalty (which informs those commitments).  In contrast, the various theories that implementers have urged (*i.e.* patentees must be denied "hold-up value" or "value that results from standardization") lack any basis in the text of the IPR policies or in patent law.

the District Court's value-eviscerating methodology are unreasonable. And the concern in those policies about the adequacy of compensation to the patent holder disproves affirmatively that proposition.

Moreover, the District Court again ignored the lack of any factual evidence that hold-up was, in this case, denying access to the patents necessary to implement the 802.11 and H.264 standards. To the contrary, the parties' expert witnesses could not say that hold-up had *ever* occurred, much less that it affected access to the patents and standards at issue. [12]   Consideration of hold-up thus improperly relied upon speculation and conjecture, and should not have been considered. *See In re Certain Wireless Devices with 3G and/or 4G Capabilities & Components Thereof,* Inv. No. 337-TA-868, at 123–24 (I.T.C. June 13, 2014) (Essex, A.L.J.) (rejecting consideration of the mere potential threat of hold-up to interpret RAND obligations where there is "evidence that it is not a threat in this case, or in this industry"). [13]

Finally, hold-up cannot exist where, as here, an implementer is not put to the

---

[12] *See* Nov. 13, 2012 Tr. 180:7–9 (Murphy) (admitting that whether hold-up exists "is an open question"); Nov. 16, 2012 Tr. 67:4–10 (Simcoe) (admitting he "can't nail down any particular license from any company as an example of hold-up"); *id.* at 135:25–136:1 (Lynde) (admitting he has "no basis from economic evidence to conclude whether or not patent hold-up is a real problem").

[13] Absent such evidence, generic policy statements about the *potential* harmful effects of hold-up cannot be given any weight. *See In re Wireless Devices*, at 124 (rejecting statements by the Department of Justice and U.S. Patent and Trademark Office that would "favor a speculative and unproven position").

choice of accepting unreasonable terms demanded by the licensor or no longer manufacturing standard-compliant products, but rather can challenge those demands in court.[14]  Fees and terms that are set by the court are necessarily unencumbered by any potential for hold-up.  Thus, claims about hold-up are simply a pretext for shifting rents from innovators to implementers.

There are additional reasons to question the existence of hold-up in the SEP context.[15]  SEP owners have every incentive to avoid opportunistic hold-up, because "[i]f they should refuse to license their portfolio, or license it at a rate that puts their licensee(s) at a competitive disadvantage, the threat to their business would be both immediate and real."  *Id.* at 117.  Conversely, implementers have incentives to "hold out" from accepting RAND license terms and forcing the innovator into serial patent litigation, with a worst-case scenario of having to pay a court determined RAND royalty after years of infringing conduct.  *Id.* at 117–18, 122–23.  Such conduct not only undermines the balance of the RAND approach by permitting extended infringement of a patentee's rights, but also creates a competitive distortion among licensees by providing the infringing-implementer

---

[14] This case is a prime example; the prospective licensee sought relief from the court almost immediately upon receiving the first offer.  *See* Appellants' Br., at 7–8.

[15] *See* Roger G. Brooks, *Patent "Hold-Up," Standards-Setting Organizations & the FTC's Campaign Against Innovators*, 39 AIPLA Q.J. 435, 446–49 (Fall 2011) (collecting comments from SSOs and others questioning the existence of hold-up).

with a cost advantage over licensed-implementers.

### C. The Deviation From Established Principles Of Contract Interpretation Led The District Court To Apply Additional Unsound Valuation Limitations.

The District Court's erroneous interpretation of RAND commitments based on a singular emphasis on the misstated objective of widespread adoption of standards, and the subordination of the objective of preserving adequate compensation of SEP owners, is further evidenced by its adoption of additional unsound modifications to the *Georgia-Pacific* factors that necessarily undervalue *all* SEPs. The District Court's acceptance of an *ex ante* incremental value approach for valuing SEPs and a novel two-step approach for determining the contribution of a patent to the value of an infringing product are examples. Imposing either constraint on SEPs' values cannot be supported under contract or patent law.[16]

#### 1. The RAND contract provides no basis for the use of an *ex ante* incremental value analysis for SEPs.

In determining RAND royalties the District Court incorporated an *ex ante* incremental value approach for determining a reasonable royalty rate. *Microsoft*,

---

[16] Qualcomm also agrees with Motorola that, generally, reliance on patent pools as a benchmark for RAND commitments is inappropriate. *See* Appellants' Br., at 28–32. As the District Court recognized, patent pools involve fundamentally different contractual licensing arrangements than those resulting from bilateral RAND negotiations. *Microsoft*, 2013 WL 2111217, at ¶¶ 498–99. There is no basis for imposing pool licensing rates on patentees who declined to participate in those arrangements.

2013 WL 2111217, at ¶ 106.  It did so notwithstanding its initial acknowledgment that the approach lacked a contractual basis, *id.* ¶ 77, and the difficulty of "linking the value of a patent to its incremental contribution to a standard," *id.* ¶ 79.  More fundamentally, the District Court failed to explain why a rational patentee could reasonably be understood to have agreed to accept only a return on the incremental value of its risky investment,[17] foregoing opportunities to invest in other endeavors that are both less risky and more remunerative.  Adopting an *ex ante* incremental value approach thus undermines the very incentives for innovators that the RAND contract seeks to preserve: an adequate return that parallels patent law's rewards to those who win the "race to discovery."  *Potts v. Coe*, 145 F.2d 27, 31 (D.C. Cir. 1944).  Preserving this incentive is crucial in the standards context because the inclusion of technology in standards is usually a winner-take-all proposition, magnifying the risks of investing in R&D.  These incentives should not be diminished regardless of any contractual or factual basis, in the name of unwritten RAND policy concerns.

---

[17] The necessary devaluing of SEPs caused by an *ex ante* incremental value test is self-evident, because the test would allow an SEP owner only the value that reflects the incremental difference of the SEP's value as compared to the value of a next best alternative.  And if two competing technologies were essentially equivalent, the *ex ante* incremental value approach would suggest that the developer of the selected technology was entitled to no royalty at all, regardless of the cost of developing that technology.  But nobody would bother to invest capital and resources to develop a new technology if there is no prospect for a reward if it is included in the standard.  No other product is subject to this kind of price cap.

The use of an *ex ante* incremental value test in calculating a "reasonable royalty" is also at odds with expectations rooted in patent law. The Federal Circuit has rejected this approach to measure reasonable royalty damages. *See Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1373 (Fed. Cir. 2008) (holding it "wrong as a matter of law" to cap "reasonable royalty damages … at the cost of implementing the cheapest available, acceptable, non-infringing alternative"), *amended on other grounds*, 557 F.3d 1337 (Fed. Cir. 2009). There is no reason to assume that the parties to the RAND commitments at issue here intended to reject that precedent.

> 2. **The RAND contract does not support an arbitrary evaluation of a patent's value to a standard, in addition to the consideration of a patent's use in the infringing product.**

Motivated again by concerns about the unproven possibility of "hold-up," the District Court analyzed "each [patent] portfolio's importance to its respective standard" before turning to the patents' "importance to Microsoft's products." *Microsoft*, 2013 WL 2111217, at *20. But the first step in this inquiry necessarily diminishes the value of any particular patent by equating and comparing it with all other patents in the standard, divorced from its end-use and any contribution the patent may make to the product that is unrelated to the standard. This is simply another method that ignores differences among patents and avoids analyzing the value that a particular patent contributes to the accused product.

Nothing in the RAND contract, IPR policies, or patent law supports this approach. The devaluation inherent in the District Court's approach is yet another step that frustrates innovators' ability to obtain the adequate compensation necessary for them to contribute to standards. Moreover, it is well-accepted that a reasonable royalty should be based on "the use made of the invention by the infringer," *LaserDynamics*, 694 F.3d at 66–67, not also weighed in the abstract against the entirety of the standard.

## CONCLUSION

The District Court's methodology for interpreting Motorola's RAND commitments contravened the terms and purposes of the relevant contracts, ignored the evidence in this case, and wrongly treated RAND-committed patents as different from other patents. This Court should disavow the District Court's methodology and expressly limit any endorsement of its specific findings of RAND royalties to the specific facts of this case, including the contributions made by the patents at issue to products involved. Otherwise, this case will detrimentally impact the incentives driving technology development, and wrongly alter the balance between innovators and implementers that has served our economy well.

Dated:    September 22, 2014          Respectfully submitted,

                                      BINGHAM McCUTCHEN LLP


                                      By: *s/ Richard S. Taffet*
                                      _____
                                          Richard S. Taffet
                                          richard.taffet@bingham.com
                                          399 Park Avenue
                                          New York, NY 10022
                                          Telephone: (212) 705-7000
                                          Facsimile:  (212) 752-5378

                                          Patrick Strawbridge
                                          patrick.strawbridge@bingham.com
                                          One Federal Street
                                          Boston, MA 02110
                                          Telephone:  (617) 951-8000
                                          Facsimile:    (617) 951-8736

                                          Stephanie Schuster
                                          stephanie.schuster@bingham.com
                                          2020 K Street NW
                                          Washington, DC 20006
                                          Telephone:  (202) 373-6000
                                          Facsimile:    (202) 373-6001


                                          *Attorneys for Amicus Curiae*
                                          *Qualcomm Incorporated*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 22, 2014, a copy of the Brief of *Amicus Curiae* Qualcomm Incorporated was filed with the Clerk of the Court using the Court's CM/ECF system, which will automatically send email notification of such filing to all counsel of record.


By:   <u>*s/ Richard S. Taffet*</u>
        Richard S. Taffet

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rules of Appellate Procedure 29(c)(7) and 32(a)(7)(C), I hereby certify:

1. this brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate procedure in that this brief contains 6,998 words, excluding those parts of the brief exempted from the type-volume calculation by Federal Rule 32(a)(7)(B)(iii) and Circuit Rule 32(b); and

2. this brief complies with the typeface and type-style requirements of Rules 32(a)(5) and 32(a)(6) of the Federal Rules of Appellate Procedure in that this brief is formatted in Microsoft Word 2010 using a proportionally spaced typeface in 14-point Times New Roman font.

Dated:  September 22, 2014

By:   *s/ Richard S. Taffet*
         Richard S. Taffet

- 33 -