No. 14-35393

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MOTOROLA, INC., MOTOROLA MOBILITY, INC., and GENERAL
INSTRUMENT CORPORATION,

*Defendants-Appellants,*

*v.*

MICROSOFT CORP.,

*Plaintiff-Appellee,*

*On Appeal from the United States District Court for the Western District of
Washington in Case no. 2:10-cv-01823, Judge James L. Robart*

**BRIEF OF *AMICI CURIAE* NOKIA CORPORATION AND
NOKIA USA INC. IN SUPPORT OF NEITHER PARTY**

XAVIER M. BRANDWAJN
ALSTON AND BIRD LLP
1950 University Avenue, 5th Floor
East Palo Alto, CA 94303-2282
Tel: (650) 838-2066
Fax: (650) 838-2001

*Attorney for Amici Curiae
Nokia Corporation and Nokia USA Inc.*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ......................................................v

STATEMENT REQUIRED BY RULE 29(c)(5) OF THE FEDERAL
RULES OF APPELLATE PROCEDURE ......................................................v

INTEREST OF *AMICI CURIAE* ......................................................1

INTRODUCTION ......................................................2

ARGUMENT ......................................................6

I.    THE DISTRICT COURT IMPROPERLY CONSIDERED "PATENT
      HOLD-UP" AND "ROYALTY STACKING" WITHOUT
      EVIDENCE. ......................................................6

      A.    "Patent Hold-Up" Should Not Limit RAND Royalties in the
            Absence of Evidence. ......................................................6

      B.    "Royalty Stacking" Should Not Limit RAND Royalties in the
            Absence of Evidence. ......................................................9

II.   THE DISTRICT COURT ERRED BY ENGAGING IN AN *EX ANTE*
      INCREMENTAL VALUE ANALYSIS. ......................................................10

III.  CONSIDERATION OF COMPARABLE LICENSES SHOULD
      ACCURATELY REFLECT THE RAND COMMITMENT. ......................................................12

CONCLUSION ......................................................15

CERTIFICATE OF SERVICE ......................................................17

CERTIFICATE OF COMPLIANCE ......................................................18

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Airborne Freight Corp. v. St. Paul Fire & Marine Ins. Co.*,
304 Fed. Appx. 484 (9th Cir. 2008)....................................................................2

*Apple Inc. v. Motorola, Inc.*,
--- F.3d ---, 2014 WL 1646435 (Fed. Cir. Apr. 25, 2014)..................................12

*Ericsson Inc. v. D-Link Sys., Inc.*,
No. 6:10-cv-473, 2013 WL 4046225 (E.D. Tex. Aug. 6, 2013) ........................10

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970) ............................................................passim

*Jim Arnold Corp. v. Hydrotech Sys.*,
109 F.3d 1567 (Fed. Cir. 1997) ........................................................................13

*Mars, Inc. v. Coin Acceptors, Inc.*,
527 F.3d 1359 (Fed. Cir. 2008) ........................................................................11

*Medtronic, Inc. v. White*,
526 F.3d 487 (9th Cir. 2008) ..............................................................................5

*Microsoft Corp. v. Motorola, Inc.*,
No. C10-1823JLR, 2013 WL 2111217 (W.D. Wash. Apr. 25, 2013).........passim

**STATE CASES**

*W. Plaza, LLC v. Tison*,
322 P.3d 1 (Wash. Ct. App. 2014).....................................................................2

**OTHER AUTHORITIES**

Apple Inc. Form 10-K (2007), available at http://www.sec.gov/ .............................8

Apple Inc. Form 10-K (2012), available at http://www.sec.gov/ .............................8

BBC News (Oct. 28, 2011), available at
http://www.bbc.co.uk/news/business-15489523. .................................................8

Commissioner Joshua D. Wright, Federal Trade Commission, *SSOs, FRAND, and Antitrust: Lessons from the Economics of Incomplete Contracts* (Sept. 12, 2013) ............................................................... 7, 8

F. Scott Kieff & Anne Layne-Farrar, *Incentive Effects from Different Approaches to Holdup Mitigation Surrounding Patent Remedies and Standard-Setting Organizations* ........................................................... 7

HTC Company Overview, available at http://www.htc.com/us/about/ .................... 8

IDC Press Release (Oct. 28, 2010), available at http://www.idc.com/about/viewpressrelease.jsp?containerId=prUS22550 010 ............................................................................................................... 8

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Nokia USA Inc. is a wholly owned subsidiary of Nokia Corporation, which has no parent corporation.  No publicly held companies own 10% or more of Nokia Corporation's stock.

## **STATEMENT REQUIRED BY RULE 29(c)(5)**
## <u>**OF THE FEDERAL RULES OF APPELLATE PROCEDURE**</u>

No counsel for any party authored this brief in whole or in part, and no person or entity, other than *amici* or their counsel, made a monetary contribution intended to fund the preparation or submission of this brief.

## INTEREST OF *AMICI CURIAE*

*Amici* are Nokia Corporation and Nokia USA Inc. ("Nokia"). Through its extensive research and development efforts, Nokia has contributed to the development and success of a number of commercially viable standards —as evidenced by the thousands of globally granted patents, including fundamental standards-essential patents, awarded to Nokia. Nokia was also one of the largest manufacturers of wireless devices for many years, and Nokia has cumulatively invested over $64 billion in research and development relating to mobile communications technologies.

Additionally, Nokia has been involved in many U.S. patent lawsuits, both as a protector of its patents and as a defender against claims of patent infringement and various royalty demands. For these reasons, Nokia understands the importance of applying balanced legal principles that adequately protect the value of standards-essential patents and the rights of innovators without unfairly intruding on the rights of others to participate in a standards-driven market. Nokia has participated as an *amicus* in other recent appeals, including on the issue of standards-essential patents. *E.g.*, *Apple Inc. v. Motorola, Inc.*, No. 2012-1548 (Fed. Cir. May 6, 2013) (Dkt. No. 183); *Ericsson, Inc. v. D-Link Sys., Inc.*, No. 2013-1625 (Fed. Cir. Feb. 27, 2014) (Dkt. No. 162).

- 1 -

**INTRODUCTION**

In its April 25, 2013 order, the District Court set out to determine a "RAND" royalty rate and range for several of Motorola's patents related to certain standards. The District Court undertook this step to allow for a subsequent determination of whether Motorola had complied with its "RAND" obligations during its licensing negotiations with Microsoft. These "RAND" obligations arose from the fact that Motorola declared certain of its patents as essential to standards promulgated by two standard-setting organizations ("SSOs") -- the Institute of Electrical and Electronics Engineers ("IEEE") and the International Telecommunication Union ("ITU"). In declaring these patents as essential to the industry standards, Motorola voluntarily undertook certain obligations, including the obligation to grant licenses to these patents on reasonable and non-discriminatory ("RAND") terms. Motorola's RAND obligations were made pursuant to intellectual property rights ("IPR") policies published by each SSO. As the Court undertook its RAND analysis to determine whether Motorola had complied with its contractual obligations, the Court viewed Motorola's obligations in accordance with the parties' intent and with the language of the documents comprising the contract.[1]

---

[1] *See Airborne Freight Corp. v. St. Paul Fire & Marine Ins. Co.*, 304 Fed. Appx. 484, 485 (9th Cir. 2008) (finding that "the touchstone of contract interpretation is the parties' intent."). *See also W. Plaza, LLC v. Tison*, 322 P.3d 1, 3 (Wash. Ct. App. 2014) (giving the plain language of the agreement controlling weight in determining the parties' intent).

The Court began its analysis by looking to the factors set forth in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970). Yet in applying these factors to a case involving standard-essential patents, the Court modified the traditional *Georgia-Pacific* analysis in several ways that could prove harmful to the standardization process if they are adopted outside the context of this specific litigation or if they are carried forward into patent infringement cases involving the assertion of standard-essential patents.

A fundamental flaw underlying the District Court's analysis is a misunderstanding of the purposes of the IPR Policies at issue, which, in turn, leads to a misunderstanding of the parties' intent in forming Motorola's RAND obligations. The RAND commitment in the standardization process is part of a delicately-balanced system designed to achieve two primary goals: (1) providing a mechanism for patent holders to obtain adequate compensation for the use of their essential IPRs; and (2) providing manufacturers of standards-compliant products access to the IPRs they need in order to implement the standards. If either of these goals is ignored, the balance underlying the standardization process will be disturbed. If patent holders are not provided with adequate compensation, they will not contribute their patented technology to standards to begin with, and there will be either a lack of innovative solutions to standardize or the standards will be based upon inferior technologies. If manufacturers are not permitted access to the

- 3 -

IPRs necessary to implement the standards, the technology will not be standardized or sufficiently adopted for the standard to be successful. In the past, market forces have maintained this balance and many of the underlying standards have been widely successful. Yet if either side's faith in the process is shaken, the parties that now invest time and billions of dollars investing in the traditional standardization process may be driven to participate in less formal, ad hoc standards or even toward totally proprietary platforms. This would in turn harm consumers, who would be forced to choose among systems unable to interconnect with one another.

As noted above, Motorola's RAND commitments relevant to this action derive from the IEEE and ITU IPR Policies.[2] Neither policy defines in specific detail what constitutes RAND royalty terms for a license to a patent declared essential to one of its standards. Rather, the SSOs instead emphasize the twin goals of the standardization process: ensuring adequate compensation for patent holders while preserving manufacturers' access to essential patents. When determining RAND royalty rates or ranges for standard-essential U.S. patents, the *Georgia-Pacific* factors may be used to model a hypothetical negotiation between

---

[2]     The IEEE IPR Policy provides that "a license for compliant implementation of the standard will be made available … under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination." IEEE-SA Standards Bd. Bylaws ("IEEE IPR Policy") § 6.2. Likewise, the ITU IPR policy states that an essential "patent holder is willing to negotiate licenses … on a non-discriminatory basis on reasonable terms and conditions." Common Patent Policy for ITU-T/ITU-R/ISO/IEC ("ITU IPR Policy") § 2.2.

the parties without unduly favoring patent holders or equipment manufacturers. *See, e.g. Medtronic, Inc. v. White*, 526 F.3d 487 (9th Cir. 2008) (finding that contracts reflecting principles of U.S. patent law should be interpreted in accordance with that patent law).

Nokia takes no position concerning the underlying merits of the dispute in this case; however, the District Court's analysis, through its modifications to the *Georgia-Pacific* factors, fails to strike the proper balance between the goals of the IPR policies at issue in this case, instead setting up a methodology which, if utilized in other cases, could harm the standardization process as a whole, potentially leading to fragmented standards and reduced interoperability among manufacturers. The opinion states that only the "widespread adoption" of the standards at issue is "the central principle of the RAND commitment." *See, e.g.*, *Microsoft Corp. v. Motorola, Inc.*, No. C10-1823, 2013 WL 2111217 ¶ 456 (W.D. Wash. Apr. 25, 2013). The District Court then advances that principle by placing restrictions on the patent owner's royalty rates in an attempt to minimize the cost of access to standardized technology for manufacturers. The District Court's analysis skews toward manufacturers in three primary ways: (1) the District Court assumes the presence of "royalty stacking" and "patent hold-up," using these concepts to limit RAND rates without requiring empirical evidence of their presence in this particular case, while simultaneously ignoring the potential for

"reverse hold-up"; (2) the District Court approves an *ex ante* incremental value methodology for the valuation of standard-essential patents; and (3) the District Court rejects proffered comparable licenses, which likely contained relevant information to the analysis being conducted, and when available may provide the best way to derive the actual value of the relevant patents at issue.  If the District Court's methodology is adopted by other district courts seeking to determine RAND royalty rates or ranges for essential patents, or adjudicating claims of patent infringement brought by standard-essential patent holders, future patent holders will likely have reduced incentives to participate in the standardization process, which could have a chilling effect on the entire industry.

## ARGUMENT

## I.    THE DISTRICT COURT IMPROPERLY CONSIDERED "PATENT HOLD-UP" AND "ROYALTY STACKING" WITHOUT EVIDENCE.

### A.    "Patent Hold-Up" Should Not Limit RAND Royalties in the Absence of Evidence.

The District Court began its analysis of the proper RAND royalty rate and range for Motorola's relevant patents by looking to the *Georgia-Pacific* factors.  *See, e.g.*, *Microsoft Corp. v. Motorola, Inc.*, 2013 WL 2111217, at ¶¶ 95-99.  The Court then modified this analysis because the patents at issue had been declared essential to certain industry standards.  In so doing, the Court limited the available royalty rate and range based upon the theoretical effects of "patent hold-up," which

- 6 -

it defined as the ability of a patent holder to demand more than the value of a standardized patent and thereby claim the value of the standard itself, without any evidence of actual hold-up having occurred. *See id.* at ¶ 103, 107, 109.

In modifying the *Georgia-Pacific* factors to account for the possibility, or even the threat of "patent hold-up", the Court's approach is problematic for several reasons. First, the relevant IPR Policies make no mention of the phenomenon of "patent hold-up," and do not outline its prevention as goals of those systems. Second, taking measures strictly to prevent the possibility of hold-up ignores completely the opposing concept of "reverse holdup," whether theoretical, threatened, or actual, which takes place where manufacturers of standardized technology continue to produce and sell standardized products, but unreasonably delay or refuse to negotiate and enter into a license on RAND terms or to pay a RAND royalty rate as determined by a court or other competent third party. Utilizing such approaches, "a potential licensee can delay good faith negotiation of a F/RAND license and the patent holder can be forced to accept less than fair market value for the use of the patent." Remarks of Commissioner Joshua D. Wright, Federal Trade Commission, *SSOs, FRAND, and Antitrust: Lessons from the Economics of Incomplete Contracts* at 30 (Sept. 12, 2013); *see also* F. Scott Kieff & Anne Layne-Farrar, *Incentive Effects from Different Approaches to Holdup Mitigation Surrounding Patent Remedies and Standard-Setting*

*Organizations*, 9 J. Competition L. & Econ. 1091, 1097 n.18 (2013).

A significant problem with any modification of the *Georgia-Pacific* analysis based on the threat of patent hold-up in setting a RAND royalty rate or range is that no evidence of any actual hold-up was presented. In fact, expert testimony in the case was unable to establish a single instance of real-world patent hold-up. *See* Nov. 16, 2012 Tr. 135:25–136:1 (Dr. Lynde stating that there is "no basis from economic evidence to conclude whether or not patent hold-up is a real problem"). This lack of evidence has also been remarked upon by federal regulators: "[d]espite the amount of attention patent hold-up has drawn from policymakers and academics, there have been relatively few instances of litigated patent hold-up among the thousands of standards adopted." Wright Remarks, *supra*, at 20.

Indeed, real world facts show that new implementers have entered the telecommunications equipment market on several occasions in relatively recent years, and many of them have rapidly become some of the most successful companies in the industry.[3] As such, there is market evidence that theoretical

---

[3]    *See* HTC Company Overview, available at http://www.htc.com/us/about/ (noting that the company has regularly introduced mobile devices since 2006); Apple Inc. Form 10-K (2007), available at http://www.sec.gov/ Archives/edgar/ data/320193/000104746907009340/a2181030z10-k.htm (noting iPhone release on June 29, 2007); Apple Inc. Form 10-K (2012), available at http://www.sec.gov/ Archives/ edgar/data/320193/000119312512444068/ d411355d10k.htm (reporting $80.5 billion in iPhone and related product and service sales in 2012) ; "Apple Joins Top Five Mobile Phone Vendors as Worldwide Market Grows Nearly 15% in Third Quarter, According to IDC," IDC Press Release (Oct. 28, 2010), available

"hold-up" is not actually preventing companies from entering or competing in these markets. A blanket rule modifying the *Georgia-Pacific* factors to account for the presence of alleged patent hold-up, without any evidence that such hold-up has taken place in the case before the court, unfairly depresses the value of essential patents and fails to serve one of the primary goals of the RAND commitment in the standardization system.

**B.    "Royalty Stacking" Should Not Limit RAND Royalties in the Absence of Evidence.**

The Court also determined that "[t]he RAND commitment also addresses royalty stacking and the need to ensure that aggregate royalties associated with a given standard are reasonable." *Microsoft*, 2013 WL 2111217, at ¶ 66; *see also id.* at ¶ 72 (finding that "a proper methodology for determining a RAND royalty should address the risk of royalty stacking by considering the aggregate royalties that would apply if other SEP holders made royalty demands of the implementer"). Based on these concerns, the Court essentially applied an upper limit to the potential royalty rate and range available to the patent holder in the case based on the percentage of all declared-essential patents that had been declared by any given patent holder. *See id.* at ¶¶ 539–46 (finding that the parties to a hypothetical

---

at http://www.idc.com/about/viewpressrelease.jsp?containerId=prUS22550010 (noting Samsung sales of 70 million units); "Samsung overtakes Apple in smartphone shipments," BBC News (Oct. 28, 2011), available at http://www.bbc.co.uk/news/business-15489523.

negotiation "would…consider other SEP holders and the royalty rate that each of these patent holders might seek from the implementer….").  Again, this analysis is flawed and harmful to the standardization process.

As with the concept of patent hold-up, none of the IPR policies at issue in this case reference the idea of royalty stacking or indicate that parties' RAND negotiations should be required to take a cumulative royalty burden into account. Yet the District Court modified the *Georgia-Pacific* analysis based on the mere threat of royalty stacking, again without any evidence of its presence.  In *Ericsson Inc. v. D-Link Sys., Inc.*, No. 6:10-cv-473, 2013 WL 4046225 (E.D. Tex. Aug. 6, 2013), the district court properly refused to instruct the jury concerning the effects of royalty stacking in similar circumstances.  *See id.* at *18 (finding that "[t]he best word to describe the … royalty stacking argument is theoretical.").  Such a theoretical concern should not provide the basis for a rule that categorically limit's a patent holder's ability to obtain fair value for its patented innovations.

## II.    THE DISTRICT COURT ERRED BY ENGAGING IN AN *EX ANTE* INCREMENTAL VALUE ANALYSIS.

The District Court also modified the traditional *Georgia-Pacific* test to incorporate, in part, an *ex ante* incremental value analysis because "the parties to a hypothetical negotiation under a RAND commitment would consider alternatives that could have been written into the standard instead of the patented technology." *Microsoft*, 2013 WL 2111217, at ¶ 106.  This approach is unreasonable in reality.

For example, if two patent holders each sought $1 per unit based on the use of a given patent each owned prior to adoption of either into a standard, the "winner" whose patented technology was adopted would apparently entitled to no compensation under this *ex ante* approach, whereas implementers would potentially be willing to pay either company $1 per unit prior to adoption in a standard. Participation in this type of process simply does not make sense for a patent holder, particularly after the investment of substantial resources in research and development in order to generate the patented technology.

Notably, courts dealing with similar issues have determined that reasonable royalty rates should not be capped "at the cost of implementing the cheapest available, acceptable, non-infringing alternative." *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1373 (Fed. Cir. 2008). Likewise, the relevant SSOs do not require that parties to essential patent licensing negotiations derive royalty rates using this approach, instead encouraging members to engage in private bilateral negotiations to determine RAND license terms. *See, e.g.* ITU IPR Policy § 2.2. The District Court itself explained the reasoning for this refusal to turn to *ex ante* valuation, noting that SSOs may be unwilling to implement such policies due to concerns involving potential antitrust liability raised by the possibility of competitors setting rates prior to litigation. *Microsoft*, 2013 WL 2111217, at ¶ 78. Where such an approach is not a part of the IPR policies of the relevant SSOs, nor

is it a part of the voluntary RAND commitments of the patent owners to those SSOs, it is inappropriate for a court to apply the approach in assessing parties' obligations under those same policies and obligations.   The District Court's analysis in this case thus serves only to inappropriately restrict RAND royalties far below amounts that would be reached in bilateral negotiations, and it should not be used in determining RAND royalty rates or ranges in other cases.

### III.   CONSIDERATION OF COMPARABLE LICENSES SHOULD ACCURATELY REFLECT THE RAND COMMITMENT.

Courts considering the valuation of reasonable royalties in the past have determined that "using sufficiently comparable licenses is a generally reliable method of estimating the value of a patent … because the royalty that a similarly-situated party pays inherently accounts for market conditions at the time of the hypothetical negotiation … ."  *Apple Inc. v. Motorola, Inc.*, --- F.3d ---, 2014 WL 1646435, at *29 (Fed. Cir. Apr. 25, 2014).  Comparable licenses generally serve as a clear indication of what the market is willing to pay for a given standard-essential patent.  Therefore, expert testimony concerning such licenses is extremely valuable to district courts setting RAND royalty rates or ranges or deciding damages claims of patent infringement based on such patents.  Even where a license may be only partially comparable to the situation presented to a court, for example where it includes licenses to additional standards beyond what is at issue in a given case, expert testimony concerning the comparable aspects of the license may often be

the best evidence concerning a patent's value that is available to the court.

Nevertheless, the District Court refused to consider several licenses offered by Motorola because they involved the settlement of ongoing litigation between Motorola and the third-party licensees. *Microsoft*, 2013 WL 2111217, at ¶¶ 415 (noting that "[t]he threat of a lawsuit…cannot form the basis for such a reasonable negotiation"), 426. Yet because in most instances equipment manufacturers begin producing equipment prior to obtaining licenses for every essential patent embodied in their products, *every* essential patent license takes place in the shadow of a lawsuit, because the patent holder has no recourse if a license agreement is not reached other than litigation.[4] Parties to a RAND license negotiation are free to set terms that meet the needs of both parties while serving the dual goals of the standardization system, including the settlement of litigation claims between them. Thus, the fact that a RAND license involves the settlement of litigation should not disqualify that license from consideration by a court attempting to determine a reasonable royalty rate or range for the same set (or subset) of patents. A qualified expert witness can extract relevant information from a license that is comparable to the disputed issues in a given case, such as the value of a subset of the licensed patents, rates applicable to a subset of covered standards, or the use of the end

---

[4]     Courts considering these issues have acknowledged this principle, noting that a patent license amounts to a promise that the licensor will not sue the licensee based on the infringement of its patents. *See, e.g. Jim Arnold Corp. v. Hydrotech Sys.*, 109 F.3d 1567, 1579 (Fed. Cir. 1997).

product price as the base against which a determined royalty rate should be applied, which would allow the court to make better use of the license.

In this case, the Court declined to consider a license proffered by Motorola in part because the agreement did not apportion the royalties to be paid amongst the separate standards licensed. *Microsoft*, 2013 WL 2111217, at ¶¶ 427-29. The court held that "[a]s a result, the court has no way of determining the value of Motorola's 802.11 and H.264 patent portfolios as distinct from Motorola's wireless cellphone portfolio and the other patents included in the RIM agreement." *Id.* at ¶ 430. Yet where the terms of an agreement do not expressly apportion royalties among standards or between standard-essential patents and those not declared as essential, expert testimony may illuminate methods of reasonable apportionment which may enable a court to compare the licenses. Thus, a court should not categorically exclude a license from consideration where its terms do not explicitly apportion royalties to be paid among several covered licensed standards.

The Court also refused to consider certain licenses covering the standards at issue in this case based in part on the fact that the licensees' sales volumes, and therefore the absolute royalties paid, were substantially lower than the situation before the court. *See Microsoft*, 2013 WL 2111217, at ¶¶ 418-19. Yet where the court is attempting to set a royalty that will be paid per unit sold by the licensee, sales volumes are an insufficient basis for exclusion of a highly probative license.

Again, expert testimony is sufficient to account for differences between relative sales volumes. This is especially true where disregarding these kinds of licenses forces a court to ignore the most relevant or comparable evidence and instead rely on no real world license evidence or on licenses covering entirely different patented technologies. *See Microsoft*, 2013 WL 2111217, at ¶ 578 (using a license covering WiFi chips as a comparable license).

## CONCLUSION

The District Court's RAND royalty valuation methodology, if applied outside the context of this case, will cause harm to the standardization system. By modifying the *Georgia-Pacific* factors to restrictively account for the essential nature of the patents at issue, the Court actually worked to unbalance the very system its method was meant to reinforce. By placing limits on RAND royalties and ranges based on the theoretical possibility of patent hold-up or royalty stacking, by limiting royalties to their *ex ante* incremental value, and by entirely disregarding potentially comparable licenses based on differences that could have been accounted for by expert testimony, the Court's methodology appears to unfairly slant  RAND determinations in favor of potentially-infringing equipment manufacturers and against adequate compensation for patent holders, a result which, if true, will dis-incentivize innovators from participating in the standardization process going forward.

- 15 -

Dated:    September 22, 2014         Respectfully submitted,


By: _s/ Xavier M. Brandwajn_
    Xavier M. Brandwajn
    ALSTON & BIRD LLP
    1950 University Avenue, 5th Floor
    East Palo Alto, CA 94303-2282
    Tel: (650) 650-838-2066
    Fax: (650) 838-2001


    *Attorney for Amici Curiae*
    *Nokia Corporation and Nokia USA*
    *Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2014, a copy of the Brief of *Amici Curiae* Nokia Corporation and Nokia USA Inc. was filed with the Clerk of the Court using the Court's CM/ECF system, which will automatically send email notification of such filing to the following counsel of record:


By:   *s/ Xavier M. Brandwajn*
        Xavier M. Brandwajn

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rules of Appellate Procedure 29(c)(7) and 32(a)(7)(C), I hereby certify:

1. this brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate procedure in that this brief contains 3,648 words, excluding those parts of the brief exempted from the type-volume calculation by Federal Rule 32(a)(7)(B)(iii) and Circuit Rule 32(b); and

2. this brief complies with the typeface and type-style requirements of Rules 32(a)(5) and 32(a)(6) of the Federal Rules of Appellate Procedure in that this brief is formatted in Microsoft Word 2010 using a proportionally spaced typeface in 14-point Times New Roman font.

Dated:  September 22, 2014

By:   *s/ Xavier M. Brandwajn*
         Xavier M. Brandwajn