No. 14-35393

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

MICROSOFT CORPORATION,

*Plaintiff-Appellee,*

v.

MOTOROLA, INC., MOTOROLA MOBILITY, INC., and
GENERAL INSTRUMENT CORPORATION,

*Defendants-Appellants.*

Appeal from the United States District Court for the Western District
of Washington in Case No. 2:10-cv-01823, Judge James L. Robart

## BRIEF OF PLAINTIFF-APPELLEE

Arthur W. Harrigan, Jr.
Shane P. Cramer
CALFO HARRIGAN LEYH
& EAKES LLP
999 Third Avenue
Suite 4400
Seattle, WA 98104
(206) 623-1700

David T. Pritikin
Constantine L. Trela, Jr.
Richard A. Cederoth
Robert N. Hochman
Nathaniel C. Love
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000

Carter G. Phillips
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

T. Andrew Culbert
MICROSOFT CORPORATION
1 Microsoft Way
Redmond, WA 98052
(425) 882-8080

*Attorneys for Plaintiff-Appellee*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Microsoft Corporation

("Microsoft") certifies that Microsoft has no parent corporation and that

no publicly held corporation owns 10% or more of Microsoft's stock.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 1

JURISDICTIONAL STATEMENT ........................................................... 5

ISSUES PRESENTED ............................................................................ 5

STATEMENT OF THE CASE ................................................................ 6

I. The Proceedings Below ................................................................ 6

II. Statement of Facts ...................................................................... 7

    A. Standardization and RAND Licensing Commitments. .......... 7

    B. Motorola's Standard-Essential Patents. ................................ 10

    C. Motorola Decides to Use its Standard-Essential Patents
    to Retaliate Against Microsoft. ............................................... 11

    D. Microsoft's Complaint and Motorola's Execution of its
    Injunction Strategy. ................................................................. 15

    E. Motorola Agrees to a Bench Trial to Determine RAND
    Royalties. .................................................................................. 18

    F. The Jury Finds That Motorola Breached its Contracts. ....... 20

SUMMARY OF ARGUMENT ................................................................ 21

STANDARD OF REVIEW ..................................................................... 23

ARGUMENT .......................................................................................... 24

I. Appellate Jurisdiction Lies In This Court. ................................. 24

II. The District Court Issued Its RAND Order Pursuant To
Motorola's Consent and Proposed Framework. ............................ 27

    A. The District Court Appropriately Determined the RAND
    Royalties. .................................................................................. 28

B. The RAND Order Was Not an Advisory Opinion. ................ 30

C. Motorola Established No Error in the RAND Royalty
Determination. ......................................................................... 33

1. The District Court Applied a "Modified Framework"
as Urged by Motorola. ................................................... 33

2. The District Court Properly Considered the
Evidence Admitted at Trial. ......................................... 35

III. Overwhelming Evidence Supports the Jury's Finding of
Breach. ............................................................................................. 43

A. Motorola Forfeited Any Claim of Insufficient Evidence of
Breach of Contract. ............................................................... 43

B. The Good Faith and Fair Dealing Jury Instructions Were
Correct. ................................................................................... 44

C. The Evidence Supports the Jury's Multiple Findings of
Breach. ..................................................................................... 47

1. The Evidence Supports a Finding That Motorola's
Entire Course of Conduct Breached its Duty of Good
Faith and Fair Dealing. ................................................. 47

2. The Evidence Supports a Finding That Motorola's
October 2010 Demands Breached its Duty of Good
Faith and Fair Dealing. ................................................. 48

3. The Evidence Is Legally Sufficient to Find That
Motorola Breached By Pursuing Injunctions. ............. 59

D. The Record Contains Substantial Evidence of Legally-
Supported Damages. .............................................................. 64

1. The *Noerr-Pennington* Doctrine Does Not Apply to
This Breach of Contract Case. ...................................... 64

2. The Jury Awarded Damages Consistent with
Washington Law. ............................................................ 66

3. The Evidence Established the Damage Element of Breach of Contract under Washington Law. .............. 70

IV. The District Court's Evidentiary Rulings Were Correct. ............. 71

    A. The Court's Rulings on FTC-Related Evidence Were Correct. ................................................................. 71

    B. The Court's RAND Findings Were Appropriately Used. ..... 74

CONCLUSION .................................................................... 78

REQUEST FOR ORAL ARGUMENT........................................ 80

STATEMENT OF RELATED CASES ....................................... 81

CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)(7)(C) & CIRCUIT RULE 32-1 ....................................................... 82

CERTIFICATE OF SERVICE.................................................. 83

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
  486 U.S. 492 (1988) ........................................................................ 7, 8

*Amerigraphics, Inc. v. Mercury Cas. Co.*,
  107 Cal. Rptr. 3d 307 (Cal. App. 2010) .............................................. 44

*Anchor Motor Freight, Inc. v. Int'l Broth. of Teamsters, Local Union No. 377*,
  700 F.2d 1067 (6th Cir. 1983) ............................................................. 69

*Apple, Inc. v. Motorola, Inc.*,
  757 F.3d 1286 (Fed. Cir. 2014) ........................................................... 47

*Apple, Inc. v. Motorola Mobility, Inc.*,
  886 F. Supp. 2d 1061 (W.D. Wis. 2012) ............................................. 65

*Aventa Learning, Inc. v. K12, Inc.*,
  830 F. Supp. 2d 1083 (W.D. Wash. 2011) .......................................... 44

*B.K.B. v. Maui Police Dep't*,
  276 F.3d 1091 (9th Cir. 2002) ....................................................... 24, 74

*Best v. U.S. Nat. Bank of Oregon*,
  739 P.2d 554 (Or. 1987) ............................................................... 30, 53

*Bores v. Domino's Pizza LLC*,
  No. 05-2498, 2008 WL 4755834 (D. Minn. Oct. 27, 2008) ................. 65

*Broadcom Corp. v. Qualcomm, Inc.*,
  501 F.3d 297 (3d Cir. 2007) ................................................................. 8

*Cecil v. Dominy*,
  418 P.2d 233 (Wash. 1966) ................................................................. 70

*Christianson v. Colt Indus. Operating Corp.*,
  486 U.S. 800 (1988) ........................................................................... 23

*City of Seattle v. McCready,*
   931 P.2d 156 (Wash. 1997) ........................................................ 67, 68

*ClearPlay, Inc. v. Nissim Corp.,*
   No. 07-81170-CIV, 2011 WL 6724156 (S.D. Fla. Dec. 21, 2011) ........ 65

*Cohn v. Taco Bell Corp.,*
   No. 92-C-5852, 1995 WL 247996 (N.D. Ill. April 24, 1995) ............... 68

*Craig v. Pillsbury Non-Qualified Pension Plan,*
   458 F.3d 748 (8th Cir. 2006) ...................................................... 44, 45

*Curtis v. Northern Life Ins. Co.,*
   No. 61372-3-I, 2008 WL 4927365 (Wash. App. 2008) ....................... 44

*Dally v. Isaacson,*
   245 P.2d 200 (Wash. 1952) ............................................................. 67

*Eastlake Constr. Co., Inc. v. Hess,*
   686 P.2d 465 (Wash. 1984) ............................................................. 67

*Frank Coluccio Const. Co., Inc. v. King County,*
   150 P.3d 1147 (Wash. App. 2007) .................................................... 44

*Gilbrook v. City of Westminster,*
   177 F.3d 839 (9th Cir. 1999) ........................................................... 23

*Gruver v. Midas Int'l Corp.,*
   925 F.2d 280 (9th Cir. 1991) ........................................................... 68

*Husain v. Olympic Airways,*
   316 F.3d 829 (9th Cir. 2002) ........................................................... 24

*In re Innovatio IP Ventures, LLC Patent Lit.,*
   921 F. Supp. 2d 903 (N.D. Ill. 2013) ................................................ 65

*In re Vylene Enterprises, Inc.,*
   90 F.3d 1472 (9th Cir. 1996) .................................................. 29, 44, 53

*Ino Ino, Inc. v. City of Bellevue,*
   937 P.2d 154 (Wash. 1997) ............................................................. 70

*Kramas v. Sec. Gas. & Oil Inc.*,
   672 F.2d 766 (9th Cir. 1982) ................................................................ 73

*Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc.*,
   599 F.3d 1277 (Fed. Cir. 2010) ........................................................... 26

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51 (Fed. Cir. 2012) ............................................................... 36

*McCollough v. Johnson, Rodenburg & Lauinger, LLC*,
   637 F.3d 939 (9th Cir. 2011) ............................................................... 72

*Merrell v. Renier*,
   No. C06-404-JLR, 2006 WL 3337368
   (W.D. Wash. Nov. 16, 2006) ................................................................ 70

*Microsoft Corp. v. Motorola, Inc.*,
   696 F.3d 872 (9th Cir. 2012) ...................................................... passim

*Mockler v. Multnomah County*,
   140 F.3d 808 (9th Cir. 1998) ............................................................... 24

*Nitco Holding Corp. v. Boujikian*,
   491 F.3d 1086, 1088 (9th Cir. 2007) .................................................. 43

*Oracle Corp. v. SAP AG*,
   765 F.3d 1081 (9th Cir. 2014) ............................................................ 25

*Parental Guide of Texas, Inc. v. Thomson, Inc.*,
   446 F.3d 1265 (Fed. Cir. 2006) ........................................................... 25

*Powertech Tech., Inc. v. Tessera, Inc.*,
   872 F. Supp. 2d 924 (N.D. Cal. 2012) ................................................ 65

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
   508 U.S. 49 (1993) ............................................................................... 66

*ResQNet.com v. Lansa, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010) ....................................................... 35, 36

*Riveredge Associates v. Metro. Life Ins. Co.*,
   774 F. Supp. 897 (D.N.J. 1991) .......................................................... 68

*Scribner v. Worldcom, Inc.*,
  249 F.3d 902 (9th Cir. 2001)..................................................... 45

*Spear Pharms., Inc. v. William Blair & Co., LLC*,
  610 F. Supp. 2d 278 (D. Del. 2009)...................................... 65

*Thompson v. Mahre*,
  110 F.3d 716 (9th Cir. 1997).................................................. 29

*U.S. Valves, Inc. v. Dray*,
  212 F.3d 1368 (Fed. Cir. 2000) ............................................. 26

*United States v. Johnson*,
  618 F.2d 60 (9th Cir. 1980)................................................... 74

*United States v. Randall*,
  162 F.3d 557 (9th Cir. 1998)................................................. 74

*W.L. Gore & Assoc., Inc. v. Carlisle Corp.*,
  529 F.2d 614 (3d Cir. 1976) ................................................. 53

## STATUTES

28 U.S.C. § 1291................................................................................5

28 U.S.C. § 1332................................................................................5

# PRELIMINARY STATEMENT

This is a breach of contract case. Motorola breached patent licensing promises to two standard-setting organizations. Specifically, Motorola committed to license on reasonable and non-discriminatory ("RAND") terms all Motorola patents "essential" to two technical standards: (1) the 802.11 "WiFi" standard for wireless communications, and (2) a video-encoding standard called H.264. But Motorola did not license, or offer to license, those standard-essential patents to Microsoft on RAND terms.

Instead, Motorola used the leverage those patents provided because they were included in industry standards as a weapon in a broader, unrelated dispute with Microsoft. To that end, in October 2010, as Motorola was preparing lawsuits seeking to enjoin the sale of Microsoft's products that complied with those standards, Motorola made illusory "offers" to license those patents to Microsoft on what Motorola called RAND terms.

Motorola demanded that Microsoft pay billions of dollars in annual royalties on standard-compliant Microsoft products. Motorola knew that its royalty demands bore no relationship to the value of its

patented inventions or to the royalties received by the holders of thousands of other patents essential to implement the two standards. As Motorola knew it would, Microsoft refused to accept Motorola's wildly-excessive demands.

Microsoft sued Motorola in the court below for breach of contract. Motorola then launched the lawsuits it had been preparing, seeking in the United States and in Germany to enjoin the sale of Microsoft Windows and Xbox. Motorola proceeded with its pre-planned lawsuits even though this breach of contract case was already underway and would fully resolve the parties' license dispute.

The district court, in defense of its jurisdiction to adjudicate this case, partially disrupted Motorola's scheme by preliminarily enjoining Motorola from enforcing an expected German injunction. This Court affirmed that order, but not before Motorola's conduct had, among other things, forced Microsoft to move its European product distribution center out of Germany to avoid devastating injury.

Both rulings on the preliminary injunction recognized that Motorola owed a contractual RAND licensing obligation to Microsoft and other implementers of the standards. Nevertheless, Motorola

continued to pursue injunctions against Microsoft's standard-compliant products in the courts and International Trade Commission, and continued to demand outsized royalties grossly disproportional to commercial or technological reality.

Against this backdrop, the district court resolved Microsoft's breach of contract claim in two phases. First, with Motorola's explicit agreement, the court conducted a bench trial to determine RAND royalties for Motorola's patents. In April 2013, the court issued extensive findings and conclusions, and determined that the RAND royalties were a minute fraction of Motorola's October 2010 demands and the royalties Motorola urged during the bench trial.

Second, the court conducted a jury trial in August-September 2013 to decide whether Motorola had breached its RAND licensing commitments, and (if so) the resulting damages to Microsoft. After hearing evidence of Motorola's entire course of conduct—from its October 2010 demands through its injunctive efforts—the jury returned a verdict for Microsoft and awarded $14.5 million in damages. The district court entered judgment on that verdict.

Motorola now seeks to walk away from its agreements and positions in the district court, and to reargue the evidence. Motorola agreed that the district court should determine RAND royalties in a bench trial, but changed its mind. Motorola told the court to apply a "modified" version of a common patent damages construct to determine RAND royalties, but now argues that the construct it urged the court to apply is riddled with errors—errors that Motorola never mentioned below. Motorola insisted on telling the jury about the Federal Trade Commission's regulatory activity with respect to standard-essential patents, but complains that the court permitted Microsoft to offer countervailing evidence. Finally, in its preliminary injunction appeal, Motorola argued (correctly) that this Court had jurisdiction, but Motorola now seeks a new forum for its appeal of the final resolution of Microsoft's breach of contract claim.

In sum, this case proceeded through a bench trial to a jury verdict of breach of contract on a course that Motorola consented to and participated in charting. The evidence presented at each trial fully supported the court's RAND royalty determination and the jury's

4

finding that Motorola breached its RAND licensing commitments. The judgment should be affirmed.

## JURISDICTIONAL STATEMENT

The district court has jurisdiction under 28 U.S.C. § 1332. The amount in controversy exceeds $75,000 and the parties are citizens of different states: Microsoft Corporation is a Washington corporation with its principal place of business in Washington, and Motorola, Inc., Motorola Mobility, Inc., and General Instrument Corporation ("Motorola") are Delaware corporations with principal places of business in Illinois and Pennsylvania. On November 12, 2013, the district court entered partial final judgment pursuant to Fed. R. Civ. P. 54(b) on Microsoft's breach of contract claim. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Whether the two prior determinations that appellate jurisdiction over this state-law breach of contract action lies with this Court were clearly erroneous.

2. Whether the district court erred by conducting, with Motorola's consent, a bench trial to determine RAND royalties, using the framework Motorola proposed.

5

3.     Whether substantial evidence supports the jury's finding that Motorola breached its contractual RAND licensing commitments by making, and persisting in making, multi-billion-dollar royalty demands on standard-essential patents, and pursuing injunctions against Microsoft's standard-implementing products when Microsoft refused to capitulate.

4.     Whether the district court abused its discretion in admitting at the jury trial:

a.     responsive testimony concerning FTC proceedings, after Motorola injected Microsoft's communications with the FTC into the case; or

b.     the RAND royalties for Motorola's patents, as determined via a bench trial to which Motorola consented.

## STATEMENT OF THE CASE

## I.     The Proceedings Below

Microsoft filed this suit on November 9, 2010.  ER1111-33.  The district court entered a preliminary injunction on May 14, 2012, ER1018-42, which was affirmed on September 28, 2012.  *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872 (9th Cir. 2012).  The court held a

bench trial on November 13-20, 2012, ER711-988, and a jury trial on August 26-September 4, 2013, ER187-586.  The court entered partial final judgment on Microsoft's breach of contract claim on November 12, 2013.  ER3-14.

## II.   Statement of Facts

### A.   Standardization and RAND Licensing Commitments.

Standardization of technology can benefit consumers and industry.  But "private standard-setting associations have traditionally been objects of antitrust scrutiny," because standardization is carried out through agreements among competitors to fix the technology available to consumers.  *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988).  Standardization vests enormous market power in firms holding patents on any part of the standardized technology:  Owners of standard-essential patents (even the owner of a single patent among the thousands necessary to implement a standard) could "hold-up" implementers of the standard.  *Microsoft*, 696 F.3d at 876.  Such patent owners may extort those that invest in implementing the standard, extracting royalties that reflect the value of standardization itself, and far exceed the value of any technology

7

captured in one holder's patents. *Id.* To minimize this abuse, and to forestall antitrust scrutiny, standard-setting organizations generally require participants in the standard-setting process, like Microsoft and Motorola, to make RAND licensing commitments. *Id.* Antitrust regulators have recognized that the potential value of standardization to consumers resulting from accelerated technology interoperability may outweigh the potential harm from permitting collusion among competitors. But "meaningful safeguards" are required for the antitrust exemptions under which standard-setting processes operate. *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 309-10, 313-14 (3d Cir. 2007); *see Allied Tube*, 486 U.S. at 500-01.

Microsoft's products implement dozens, if not hundreds, of technical standards prescribed by standard-setting organizations. Microsoft, like others who produce standard-compliant products, therefore needs the assurance of RAND patent licensing commitments. Once a standard becomes widely implemented, and standard-compliant products are widely distributed, producers have no reasonable technical or commercial alternative to compliance with the standard consumers have come to expect.

As this Court already recognized, implicit in the "sweeping promise" of the RAND licensing commitment "is, at least arguably, a guarantee that the patent-holder will not take steps to keep would-be users from using the patented material, such as seeking an injunction, but will instead proffer licenses consistent with the commitment made." *Microsoft*, 696 F.3d at 884. Whatever right to exclude patents might carry normally, the owners of patents declared essential to an industry standard have chosen not to exclude others from using their technology, in return for no more than a RAND royalty and the benefits of having their technology included in the standard.

The threat of such injunctions is extremely dangerous. If just one patent holder, with one patent covering even a marginal portion of the standard, backed a demand for excessive royalties with the pursuit of an injunction, those who produce standard-compliant products would have no options. Even if it were possible to recall all existing products and modify them to remove the marginal feature (and do so for all products going forward), the products would no longer be standard-compliant, and so consumers would have no assurance that they would interoperate with other standard-compliant products. The existence of

9

RAND licensing commitments thereby encourages adopters to design standard-compliant products. ER241(17:10)-ER242(18:1), ER247(40:15-22), ER426(141:4)-ER427(143:9).

**B.     Motorola's Standard-Essential Patents.**

Motorola is one of more than 50 entities that made RAND licensing commitments with respect to H.264 standard-essential patents. ER1502. Many of the core innovations of H.264 are unpatented, though more than 2,500 patents worldwide have been declared essential to the standard. *Id.*

Motorola is one of nearly 100 entities that made RAND licensing commitments with respect to 802.11 standard-essential patents. ER1553-54. As with H.264, much of the technology embodied in 802.11 is in the public domain, ER1549, though there are thousands of patents declared essential to the standard, ER1554.

In findings Motorola does not challenge, the district court found that Motorola's H.264 patents "constitute[ ] a sliver of the overall technology" in the standard, providing "only minimal contribution," and that "Motorola did not provide the inventive technology, but instead built upon already-existing technology." ER1624-25. Likewise, the

court found that Motorola's 802.11 patents provided "very minimal technical contribution" to the standard, and that "the record was clear that Motorola did not provide the inventive technology in any area." ER1638.

Motorola's RAND licensing commitments created contractual obligations enforceable by Microsoft and others who use or seek to use the standards.  *Microsoft*, 696 F.3d at 878, 884.  The district court construed those contracts to require Motorola to make available and grant licenses to its 802.11 and H.264 standard-essential patents on RAND terms.[1]  But Motorola did not live up to its RAND licensing commitments.

### C.  Motorola Decides to Use its Standard-Essential Patents to Retaliate Against Microsoft.

In Fall 2010, after Motorola failed to renew a license to Microsoft proprietary technology, Microsoft and Motorola became engaged in an intellectual-property dispute.  On October 1, 2010, Microsoft filed suits

---

[1] Motorola waived any objection to this construction of the contracts when it failed to object to the portion of the jury instructions explaining the contracts' requirements.  Motorola objected only to the existence of the contracts and Microsoft's status as a third-party beneficiary, ER501(205:12)-02(208:21), both of which Motorola had already conceded, *see Microsoft*, 696 F.3d at 878 n.6 (quoting Motorola's concession).

alleging that Motorola smart phones infringed certain Microsoft patents unrelated to the 802.11 or H.264 standards.

In retaliation, Motorola turned to its standard-essential patents. Motorola knew that Microsoft's Windows operating system included (among thousands of features) the ability to view videos encoded under the H.264 standard, although this was far from a core Windows functionality. Motorola also knew that Microsoft's Xbox video game console included the option of connecting to an 802.11 WiFi network (as an alternative to a wired connection) for Internet access, and could also display H.264 video, although that standard is not used in playing video games. ER262(98:5-101:9). Motorola knew that an injunction on even one of its standard-essential patents—no matter how tangential to the core value of Windows or Xbox—could give it massive leverage over Microsoft. An injunction would not only deny Microsoft the ability to sell standard-compliant products, but it would also (at least for a time) stop Microsoft sales of two of its flagship products.

To lay the groundwork for suits seeking injunctions in the face of Motorola's commitment to grant RAND licenses, in October 2010, Motorola sent letters to Microsoft offering to license Motorola's 802.11

and H.264 standard-essential patents. For its 802.11 patents, Motorola demanded 2.25% of the sales price of Microsoft's Xbox, ER1158—around $4.50 per unit, which exceeds the cost of the entire chipset that provides 802.11 capability to the Xbox. ER311(87:1-3). For H.264, Motorola demanded that Microsoft pay 2.25% in royalties not merely on the price of Microsoft Windows software, but on the sales price of any computer worldwide running Windows software. ER1136. Motorola knew that its demands exceeded $4 billion in annual royalties. Motorola also knew that its patents represented only a tiny portion of the technology reflected in the standards, and that these standards were, at best, tangential to the Microsoft products. Motorola gave Microsoft 20 days to respond. ER1136, ER1158.

Although Motorola labeled its demands as "RAND," *id.*, Motorola knew they were not, and knew Microsoft would not accept them, ER267(118:4-7), ER283(185:5-11). Motorola had never licensed its 802.11 or H.264 patents at such royalties, ER257(79:7-13), nor had it ever demanded that a licensee pay 2.25% on end-products sold by the licensee's customers, ER254(69:25)-ER255(70:9); *see* ER488(151:3-11). To the contrary, in 2003 Motorola had participated with many other

13

prospective licensors in creating a patent pool for licensing all the licensors' H.264 patents, and had endorsed royalties of 10 cents per unit for the entire set of thousands of H.264 standard-essential patents in the pool, in contrast to Motorola's demand that Microsoft pay $11.25-$22.50 or more per unit for just Motorola's patents. ER307(72:15)-ER308(75:20), SER110-28, ER325(144:20-145:9). As for 802.11, Motorola had engaged a consultant, InteCap, to value its 802.11 patents, and that study suggested RAND royalties of less than 2 cents per unit, in contrast to Motorola's demand of $4.50. ER1644-51, ER386(163:16-165:10), ER386(165:23)-ER387(166:13), ER266(114:10-22).

Motorola knew the financial implications of its royalty demands. ER255(71:9-73:9), ER256(74:17-75:18), ER262(100:9-14). If each of the 52 entities with H.264 standard-essential patents demanded 2.25%, the aggregate royalty would far exceed the prices of standard-compliant products. ER384(154:22-25), ER385(160:12-20). If each of the 92 entities with 802.11 standard-essential patents demanded 2.25%, the aggregate royalty would be more than double the end-product price. ER385(158:6-8, 161:5-11); *see* ER470(79:4-18). Especially because these

are only two of the many standards implemented in Microsoft's products, the royalties Motorola demanded were commercially impossible for any licensee.

Motorola had never licensed its 802.11 and H.264 patents on a standalone basis at 2.25% or any other royalty.  ER256(77:15-21). Those patents had simply been included in broad cross-licenses primarily focused on Motorola's cellular telecommunications patents, which are declared essential to standards that enable cellular telephony.  ER256(77:22)-ER257(78:6).  Motorola contended it had a strong patent position in the universe of cellular patents, ER258(82:6-8), but those patents have no connection to this case.  Motorola had no reason to believe that its non-cellular, 802.11 and H.264 patents were of any particular significance or any more valuable than the patents essential to those standards owned by dozens of other companies. ER260(90:4-8, 91:13-17).

### D.   Microsoft's Complaint and Motorola's Execution of its Injunction Strategy.

Faced with Motorola's illusory offers, Microsoft filed this suit on November 9, 2010, asserting breach of contract and related state-law claims, and seeking damages and other relief.  ER1111-35.  Within

days, Motorola filed its pre-planned lawsuits seeking injunctions against Microsoft's standard-compliant products.[2]  Despite the existence of this contract litigation—seeking a ruling determining actual RAND royalties, and confirming Microsoft's right to RAND licenses—Motorola persisted in seeking injunctions.  That forced Microsoft to incur significant costs avoiding injunctions in Motorola's unnecessary suits. Microsoft further committed in writing in September 2011 to take a RAND license, ER453(10:17-11:14), but Motorola's pursuit of injunctions continued.

In addition to district court and ITC actions in the U.S., Motorola sued in Germany on two German H.264 patents, and by early 2012 was on track to obtain an injunction barring sales of Microsoft's products in Germany.  Motorola's German action placed Microsoft in serious jeopardy.  Germany is a major European market in its own right.  More important, Germany was the location of Microsoft's distribution center (for products including Windows and Xbox) for all of Europe, the Middle

---

[2] Microsoft later amended its complaint, alleging that Motorola's entire course of conduct—including both its royalty demands and pursuit of injunctions—breached its contractual RAND licensing commitments. ER1083-110.

16

East, and Africa. ER362(66:21-67:16). Because of the enormous losses that would occur if Motorola's German injunction were entered—disrupting for months Microsoft's distribution center for a large part of the globe—Microsoft had to (and did) relocate its distribution center to the Netherlands, at significant expense. ER362(68:14)-ER363(71:20), ER366(83:1-4); *see* ER242(19:6-21:6), ER248(44:14)-ER249(46:13), ER327(151:16-152:10), ER442(205:17-25).

In May 2012, to defend its jurisdiction to adjudicate this breach of contract case, the district court entered a preliminary injunction barring Motorola from enforcing any injunction it might obtain in Germany. ER1018. This Court affirmed. *Microsoft,* 696 F.3d at 889. While that ruling prevented Motorola from blocking Windows and Xbox from the German market, Microsoft had been forced to move its facility in the spring of 2012 because of the uncertainty of the outcome of that litigation and the enormous costs of any interruption in the product flow.[3] Moreover, Microsoft continued to spend millions of dollars defending itself against Motorola's other injunctive efforts. Motorola

---

[3] As the jury was instructed (without objection), Microsoft was obligated to mitigate its damages. ER517(36:2-9), SER35.

did not drop its last attempt to obtain an injunction on standard-essential patents until January 2013, long after it knew that it could secure everything it was entitled to (a license on RAND terms) in the district court proceedings below.  ER454(17:13-23), ER453(10:17-11:14).

### E. Motorola Agrees to a Bench Trial to Determine RAND Royalties.

In the meantime, Microsoft sought summary judgment that Motorola had breached its RAND contract.  Motorola opposed Microsoft's motion, arguing that it should be permitted to present evidence showing that its 2.25% demands were in fact reasonable.  SER81-82, ER179-81.  The district court accepted Motorola's position that it could not decide whether Motorola had breached its RAND licensing commitments without knowing the appropriate RAND royalties for Motorola's patents.  ER180-82.

The parties mutually agreed to a bench trial in November 2012 to determine the worldwide RAND royalties for Motorola's U.S. and foreign 802.11 and H.264 standard-essential patents.  SER74(42:15)-SER75(43:2), ER141.  In that trial, Motorola's technical experts did not show that Motorola's patents contributed more than minimal value to the standards.  Motorola's "historical evidence" of licensing (Motorola

18

Brief ("Br.") 11) concerned patents with no relationship to its 802.11

and H.264 patents.  The most probative evidence of RAND royalties for

these patents came from other historical Motorola conduct—including

its participation in and approval of royalties for the H.264 patent pool,

and the InteCap valuation of Motorola's 802.11 patents.

The court issued its findings and conclusions in April 2013 ("the

RAND Order"), largely applying the framework that Motorola had

proposed.  The court began with the purposes of the RAND licensing

commitment:  widespread adoption of the standard, ER1470; prevention

of royalty stacking, ER1473-74 (relying on Motorola's own emphasis of

that risk, SER102-04); and prevention of patent hold-up, ER1471-72

(adopting Motorola's expert's testimony that "the RAND commitment

and the whole apparatus exists to deal with hold-up," ER951:13-16).[4]

To determine RAND royalties, the court considered multiple

comparables, but relied on those that were consistent with these

purposes underlying RAND licensing commitments.  ER1615-17,

―――――――――――――

[4] The notion that competitive harms from hold-up and unchecked
royalty stacking must actually be allowed to occur before the need to
prevent them can be considered (*see* AIPLA Br. 17-21; Nokia Br. 6-10;
Qualcomm Br. 19-27) makes no sense, and ignores the antitrust
implications of the standard-setting process.

ER1626-28, ER1631-54. The court rejected comparables that presented hold-up and stacking concerns. ER1580-98.

In June 2013, Microsoft tendered to Motorola the approximately $6.8 million in past royalties that result from applying the RAND royalties determined by the court, and undertook to pay future royalties as they arise. SER43-47. Motorola refused to accept.

## F.   The Jury Finds That Motorola Breached its Contracts.

The district court conducted a jury trial on Microsoft's breach claim in August-September 2013. Microsoft demonstrated that Motorola's strategy—starting with excessive royalty demands in October 2010 that could not be accepted, following through with actions for injunctive relief, and persisting in this tactic into 2013—both directly breached Motorola's RAND licensing commitments, and breached the covenant of good faith and fair dealing inherent in every contract. Motorola tried to block any mention of the RAND royalties to the jury. The court held that very purpose of the bench trial to which Motorola had agreed was to make that determination. The court took a balanced approach, giving the jury the distilled outcome of the RAND royalty trial, and permitting limited use of the RAND findings, while

instructing the jury that those findings had not resolved any question of breach. Microsoft also proved that Motorola's breach—including its relentless effort to shut down Microsoft's German distribution of Windows and Xbox—caused it to incur (1) the costs of relocating its European distribution center, and (2) fees for defending against Motorola's injunctive actions in Germany and the United States.

The jury found that Motorola's conduct generally, and Motorola's pursuit of injunctions specifically, breached its contracts as to both the 802.11 and H.264 standards, and awarded damages in both categories. ER44-46.

## SUMMARY OF ARGUMENT

Appellate jurisdiction lies in this Court, as Motorola urged before, and as this Court and the Federal Circuit ruled. Motorola's arguments that this breach of contract case somehow morphed into a case arising under the patent laws misrepresent the district court's findings and lack legal support.

Motorola and Microsoft both agreed to a RAND royalty bench trial as a predicate to a trial on breach, and Motorola urged the framework for assessing RAND royalties that the court ultimately adopted. In any

event, Motorola's backtracking aside, the court's procedures were correct and its findings are well-supported by the evidence. The RAND royalties determined in the bench trial were not "advisory," but were factual findings available to the jury when it assessed "the entire context and circumstances" of the breach (Br. 15), which Motorola concedes must be considered. Federal Circuit patent damages law does not govern the meaning of the parties' contract. Moreover, whether assessed as a matter of patent damages or contract, Motorola's assault on the RAND royalty determination itself fails. Motorola ignores the court's actual reasoning and the lack of any evidence to support its contention that its exceptional royalty demands were justified. Motorola also ignores the substantial evidence—including evidence of Motorola's real-world practices—which demonstrated that Motorola's demands were not justified. The demands were designed not to produce a license agreement, but served only as a predicate for coercive conduct designed to extract royalties far in excess of those to which Motorola was entitled under its RAND licensing commitments.

The jury heard that Motorola backed its multi-billion-dollar royalty demands by seeking injunctions against Microsoft's core

products in the United States and in Germany.  The district court

properly instructed the jury on breach and on the covenant of good faith

and fair dealing.  Overwhelming evidence supports the jury's finding

that Motorola breached its RAND licensing commitments and caused

legally-compensable harm to Microsoft.  The court's balanced handling

of evidence concerning the FTC and the RAND trial findings provides

no basis for disturbing the jury's verdict.  The judgment should be

affirmed.

## STANDARD OF REVIEW

Prior determinations of appellate jurisdiction should not be

disturbed unless the initial decision was "clearly erroneous and would

work a manifest injustice." *Christianson v. Colt Indus. Operating Corp.,*

486 U.S. 800, 817 (1988).  The denial of a motion for judgment as a

matter of law should be affirmed if the verdict is supported by

substantial evidence.  *Gilbrook v. City of Westminster*, 177 F.3d 839, 856

(9th Cir. 1999).  Formulation of jury instructions is reviewed for abuse

of discretion.  *Id.* at 860.  Jury instructions challenged as misstatements

of law are reviewed *de novo*, and a verdict will be set aside due to an

error only where the error is not harmless.  *Mockler v. Multnomah*

23

*County,* 140 F.3d 808, 812 (9th Cir. 1998). A district court's findings of fact will be affirmed unless clearly erroneous. *Husain v. Olympic Airways*, 316 F.3d 829, 835 (9th Cir. 2002). "Evidentiary rulings are reviewed for an abuse of discretion and should not be reversed absent some prejudice." *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1103 (9th Cir. 2002).

## ARGUMENT

### I.   Appellate Jurisdiction Lies In This Court.

In appealing the preliminary injunction to this Court, Motorola explained that "[b]ecause Microsoft's complaint is pleaded in terms of contractual rather than patent rights, this appeal is properly brought before this Court and not the Federal Circuit." SER78. This Court agreed, *Microsoft*, 696 F.3d at 881, and that ruling is law of the case. Nevertheless, having lost in its previous appeal, Motorola sought a different forum and noticed this appeal to the Federal Circuit. That court rejected Motorola's blatant forum-shopping, and agreed that this Court has jurisdiction. (Dkt. 1.)

In asking this Court to come to a different conclusion, Motorola does not contend that Microsoft asserted a patent claim, nor does it

24

deny that Microsoft sued for breach of contract.  Instead, Motorola asserts that the *district court* (not Microsoft) "*constructively*" (not actually) amended Microsoft's complaint such that the bench trial was "*for all intents and purposes*" a patent damages trial "requiring the resolution of substantial questions of patent law."  (Br. 18-19 (emphasis added).)  This is both factually wrong and legally irrelevant.

The district court did not determine damages for patent infringement.  To be sure, the court considered the value of Motorola's patented technology to the extent relevant to the breach of contract claim.  But that did not convert the contractual RAND royalty analysis into a determination of infringement damages under 35 U.S.C. § 284.  As the court explained, any analysis "under a RAND obligation *must be different* than the typical [hypothetical negotiation] analysis historically conducted by courts in a patent infringement action."  ER1482 (emphasis added).[5]  The use of a hypothetical negotiation valuation framework is common in contexts beyond patent damages, *see Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1087-93 (9th Cir. 2014) (copyright

---

[5] *Parental Guide of Texas, Inc. v. Thomson, Inc.*, 446 F.3d 1265, 1267 (Fed. Cir. 2006) (Br. 19), concerned a "Litigation Royalty" defined explicitly by 35 U.S.C. § 284.

case), and does not make this a patent case. Nor does the valuation of patented technology raise a substantial question of patent law, any more than would a case involving a corporate acquisition in which the price depended on the value of patents. *See Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc.*, 599 F.3d 1277, 1284 (Fed. Cir. 2010) ("[T]he mere presence of a patent as relevant evidence to a claim does not by itself present a substantial issue of patent law.").

Unlike the cases upon which Motorola relies, this case did not require the district court to construe patent claims or address infringement. (Br. 19, citing *Portney v. CIBA Vision Corp.,* 401 F. App'x 526, 528 (Fed. Cir. 2010) (unpublished) (requiring "a claim construction hearing to determine the boundaries of [the] patents"); *U.S. Valves, Inc. v. Dray*, 212 F.3d 1368, 1372 (Fed. Cir. 2000) (determining breach of contract required interpreting the patents and determining infringement).) There was no dispute that Microsoft's products implemented the standards, and the court treated Motorola's patents as essential even though "none of the terms comprising the claims … ha[s] been construed by a court." ER1506, ER1512, ER1516, ER1524,

26

ER1529.  *See* ER1555-56 n.13 (Microsoft's experts "did not dispute" that Motorola's patents were essential).

Motorola's assertion that the court relied on invalidity findings in a Motorola-filed patent case (Br. 19) is incorrect.  The ruling Motorola cites (ER665-92) did not inform the RAND royalty determination.  The patents that were the subject of that invalidity ruling were part of a family of related Motorola patents.  ER1514.  With no mention of invalidity, the court stated that this family of patents was standard-essential, ER1516, and explained how the parties would value that technology in light of Motorola's RAND commitment, ER1521-22.  No substantial issue of patent law was decided here.

## II.  The District Court Issued Its RAND Order Pursuant To Motorola's Consent and Proposed Framework.

There was nothing procedurally or substantively improper in the RAND royalty bench trial.  Motorola consented to the procedure.  The evaluation of the RAND royalty and the role the RAND royalty determination played in the breach trial were entirely proper.

**A.** **The District Court Appropriately Determined the RAND Royalties.**

Motorola consented to a bench trial to determine the RAND royalties for its patents. At a June 14, 2012 hearing, the court sought the parties' positions on whether the court or a jury should determine RAND royalties. Microsoft stated: "[T]he parties agree there is no jury involved." SER74(42:15-18). Motorola agreed: "Our agreement is that the court would decide all the material terms of the RAND license." SER74(42:25)-SER75(43:2). As the court subsequently ruled: "On June 14, 2012, both Microsoft and Motorola agreed to determine the RAND royalty rate by bench trial." ER141.

Motorola apparently later regretted its agreement. When it claims that it "***opposed*** the district court's improper decision to sever the RAND rate from the overall good-faith determination and hold a bench trial on that single issue prior to jury trial" (Br. 51), Motorola is referring to its after-the-fact efforts to renege. *See* ER989-1017. The district court rejected Motorola's about-face, observing "isn't it rather late in the game for Motorola to repudiate concessions made during oral argument and announce another new theory of the case?" SER64(5:16-20). As the court carefully analyzed in a ruling before the jury trial,

28

ER103-10, Motorola waived any right to have a jury determine the

RAND royalty (or to have the jury decide breach with no such

determination at all).  *See Thompson v. Mahre*, 110 F.3d 716, 721 (9th

Cir. 1997) (party waived jury trial right on an issue through stipulation

to and participation in a bench trial to resolve that issue).[6]

Motorola's waiver aside, its argument mischaracterizes the RAND

royalty determination as dispositive of breach.  (Br. 2.)  Motorola

advocates a "fact-intensive" analysis, with no one fact necessarily

dispositive.  (Br. 20.)  And that is precisely what the jury was told:

> the size of an offer alone is not exclusively
> dispositive of whether Motorola has breached its
> duty of good faith and fair dealing.  To determine
> whether Motorola's offer breached its duty of good
> faith and fair dealing, you must use the standard
> set forth in Instruction Number 16.

ER68:4-8, SER26.  This instruction favored Motorola more than the law

required.  Authority Motorola ignores holds that "the size of an offer

alone" *can* be so extreme as to constitute a breach.  *See In re Vylene*

*Enterprises, Inc.*, 90 F.3d 1472, 1477 (9th Cir. 1996) (California law)

(party breached the duty by proposing a franchise agreement that was

_____

[6] Motorola's consent to the court determination of the RAND royalties
precludes its newly-urged Seventh Amendment argument.  (Br. 52.)

"commercially unreasonable"); *Best v. U.S. Nat. Bank of Oregon*, 739 P.2d 554, 559 (Or. 1987) (Oregon law) ("When a party has the contractual right to specify a price term, the term specified may be so high or low that the party will be deemed to have acted in bad faith."). Instruction 16, to which the court directed the jury, listed objective and subjective grounds to consider in deciding whether a breach occurred. ER63:19-65:21, SER22-23. Under any view of the law, whether Motorola's demands were unreasonably high is plainly *relevant* to whether Motorola breached.

## B. The RAND Order Was Not an Advisory Opinion.

Motorola's argument that the RAND royalty determination was "advisory" makes no sense. Motorola agreed that the court should assess RAND royalties (as terms of the relevant contracts) as a predicate to the jury trial on breach. Moreover, prior to the bench trial, Motorola successfully opposed Microsoft's motion for summary judgment, claiming that evidence (including Motorola's prior licenses and licensing practices) showed that "Motorola's offer plainly was *reasonable*." SER81-82. Motorola cannot now credibly argue that the

30

court's evaluation of the evidence it urged the court to evaluate produced an advisory opinion.

Further, Motorola acknowledges that the "covenant of good faith and fair dealing requires a factfinder to consider the entire 'context' and 'circumstances' of the dealings between the parties." (Br. 34.) As noted above, the jury was instructed to do just that, and the "context and circumstances" plainly include RAND royalties for Motorola's patents.

Whether Microsoft sought specific performance (Br. 22-24) does not matter. First, Microsoft's request for relief was the same at the RAND royalty trial as it was months earlier when Motorola agreed to that procedure. Second, Microsoft sought a declaration that Motorola had not offered royalties "under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination," ER1107, as well as "a judicial accounting" of RAND royalties for Motorola's patents, ER1114-15. Each of those claims for relief required determining RAND royalties.

Nor does it matter that patent license agreements can be complex. (Br. 24-25.) The RAND royalties are key contract terms, and the determination of those royalties informed the resolution of the dispute

31

between the parties. Moreover, the other "complex" terms to which Motorola points are all subsumed in the RAND licensing commitment. The "duration" of any RAND license is life-of-patent. ER1487. "Cross licenses" are irrelevant because standard-essential patents have value independent of the value of other standard-essential patents: cross-licensing could affect the form, but not the value, of RAND compensation. ER1580-81. The "non-discriminatory" requirement bars Motorola from varying royalties based on what patents a licensee holds. Similarly, "royalty caps" potentially discriminate against low-volume "start-up" implementers (who would pay higher per-unit royalties). The "geographical" scope is worldwide, and the "product scope" must extend to any standard-compliant product. Even if these terms were open to debate, the court's determination of the undeniably key royalty term was still essential to resolution of Microsoft's claims and Motorola's defenses.

**C.    Motorola Established No Error in the RAND Royalty Determination.**

### 1.    The District Court Applied a "Modified Framework" as Urged by Motorola.

Patent damages law does not govern the determination of RAND royalties for standard-essential patents, just as rules governing state-law trespass damages do not govern the determination of a contractually-constrained monthly rent.  By making RAND licensing commitments, Motorola waived any entitlement to ordinary patent damages for infringement, and agreed it would seek and accept only RAND royalties from any standard implementer.

To determine RAND royalties, the district court did not simply adopt Federal Circuit damages law; rather, at Motorola's urging, the court used "a modified form of the well-known *Georgia-Pacific* hypothetical negotiation."  SER53; *see* ER1479-91.  Motorola's complaints on appeal ignore what Motorola asked, and did not ask, the district court to do.

For example, Motorola argues that the court failed to select the correct date for the hypothetical negotiation.  (Br. 25-27.)  Motorola offers no reason why that inquiry would be required in this contract

case. Indeed, Motorola itself *never* proposed a specific date, and its expert testifying about the hypothetical negotiation made no mention of any time period. ER1694(132:2)-98(147:2). Having ignored this supposedly crucial factor below, Motorola cannot claim error now.

Motorola also takes contradictory positions regarding the date. Motorola suggests that evidence concerning Google should not have been considered because Google acquired Motorola in 2012, after Motorola sent its October 2010 letters. (Br. 27.) But the primary "historical license" on which Motorola relied dated from December 2011, *after* Motorola's proposed cutoff. ER1696(138:12-139:1), ER1701-14.[7]

Motorola asserts that the court "appears to have set the value at the time of the bench trial the court issued the RAND Order [*sic*]." (Br. 27.) Whether Motorola means that the court used November 2012 (the

---

[7] There was no error in the court's reference to Google. (Br. 27.) First, the court noted that Google's participation in the H.264 pool "further corroborates" that the pool is an appropriate benchmark. ER1617. Motorola participated in the pool's formation, ER1601-07, so the court's reliance was well-founded regardless of Google. Second, the presumption that Google and Microsoft would value pool membership similarly because both were "substantial technology firms with vast arrays of technologically complex products" only led to a *higher* RAND royalty—benefitting Motorola, because its status as a less-substantial, less-diverse firm would have reduced the value of pool access. ER1620-21.

time of the bench trial) or April 2013 (when the RAND Order issued), it cites nothing from the court's decision to support its assertion. The court (consistent with the approach Motorola urged) considered a hypothetical negotiation in light of the RAND commitment—which includes the principle of not discriminating against any implementer at any time—and the evidence presented at trial. ER1490-91.

## 2. The District Court Properly Considered the Evidence Admitted at Trial.

Attempting to retry facts on appeal, Motorola argues that the district court should have concluded that Motorola's licensing evidence was persuasive, while Microsoft's was not. The court as factfinder determined which prior licenses were comparable to the RAND license to which Motorola committed. Motorola presents no reason to second-guess that fact determination.

Motorola simply ignores the court's findings that Motorola's "actual licenses" were non-comparable. Motorola emphasizes that its licenses emerged from litigation settlements, which the Federal Circuit has said could be "the most reliable license[s]" in some patent damages settings. (Br. 32, citing *ResQNet.com v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010).) Motorola misrepresents the Federal Circuit's view. The

35

Federal Circuit has consistently warned that litigation settlements should rarely be used to assess patent damages, because the "coercive environment" of litigation can skew the results of the hypothetical negotiation, *ResQNet.com*, 594 F.3d at 872, making such agreements "unsuitable to prove a reasonable royalty," *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012). Indeed, in the case Motorola cites, the Federal Circuit identified the litigation settlement as the "most reliable" on that record only because the other licenses the patentee offered bore "no relationship at all to the claimed invention." *ResQNet.com*, 594 F.3d at 869-70.

The district court here properly evaluated the substantial differences between the licenses Motorola offered and a license on RAND terms. The first license Motorola's expert offered (to VTech, a cordless phone manufacturer) included the 802.11 and H.264 portfolios only as part of a license for a set of cordless-phone patents that Motorola accused VTech of infringing. ER1582-83, ER1701-14. The court properly found that agreement not probative of a RAND royalty for Motorola's 802.11 and H.264 patents because (1) its value was dominated by the unrelated cordless-phone patents; (2) it was signed

36

during the pendency of this case, on the eve of a hearing in Motorola's ITC action asserting 802.11 patents against Microsoft, where Motorola attempted to use the newly-minted VTech agreement as evidence of the reasonableness of its demands; and (3) VTech had paid only "trivial royalties." ER1583-85.

The second license, to RIM (a cellular handset manufacturer), was signed under threat of an ITC exclusion order based on Motorola's assertion of cellular standard-essential patents against RIM's Blackberry products. ER1589. That license was dominated by Motorola cellular patents, which have no connection to this dispute. ER1585-86. The court correctly concluded that the royalties RIM agreed to pay for access to Motorola's cellular patents were not relevant to the RAND royalty for Motorola's 802.11 and H.264 patents, where those latter patents were simply bundled with the dominant cellular patents in the same agreement. ER1587-90. Indeed, the fact that the royalty did not increase with the inclusion of 802.11 and H.264 patents supports the conclusion that those patents added little or no value. ER1590. In any event, the court relied on *Motorola's* expert's testimony that it would be a "pretty tough thing" to apportion out the value of the

37

802.11 and H.264 patents from such a license, and noted that Motorola did not even attempt to do so.  ER1588.[8]

The third, fourth, and fifth licenses Motorola offered were granted by Symbol Technologies (later acquired by Motorola) for a handful of 802.11 patents.  ER1590-95.  The court found no evidence that the licenses reflected consideration of Motorola's RAND commitment, and noted that the agreements centered on patents that expired before October 2010, and patents that were otherwise not relevant or valuable to Microsoft or the 802.11 standard.  ER1592-94.  The fact that two agreements arose from litigation was only one of several factors undercutting their relevance.  *Id.*

Motorola's complaints about the evidence that the court found more probative of a RAND royalty (Br. 28-32) similarly ignore the record and the court's reasoning.  For example, Motorola ignores the court's basis for concluding that H.264 pool royalties were probative of RAND royalties:  Motorola participated in the formation of that pool;

---

[8] Amicus Nokia argues that "expert testimony may illuminate methods of reasonable apportionment [for 802.11 and H.264 patents] which may enable a court to compare the licenses."  (Nokia Br. 14.)  Perhaps, but Motorola's expert made no attempt to do so.

Motorola argued for lower royalties in that context; and Motorola approved press releases announcing the pool's licensing terms. ER1601-05. Motorola did not object to the pool's licensing model, which treated all standard-essential patents as equal when allocating royalties—a model adopted by other pools in which Motorola already participated. ER1605-06. Despite Motorola's last-minute withdrawal from the pool, ER1607, the court had ample basis to conclude that the pool royalties informed a RAND royalty.

Motorola's complaint that pool licenses are "'radically different' from a bilateral negotiation between the two parties" (Br. 28) is a straw man. The question before the court was what evidence was probative of a RAND royalty, and whether the pool royalties could be *considered* in the court's hypothetical negotiation. Motorola provides no explanation why they could not. The pool granted licenses on RAND terms to thousands of H.264 standard-essential patents—terms to which Motorola had agreed before its change of heart. Motorola disputes none of the extensive findings the court made in determining that the pool royalties were informative of the RAND royalty. ER1609-17. Similarly, although Motorola had not participated in the formation of the Via pool,

the court made detailed findings and concluded that the Via pool provides "an indicator of a RAND royalty rate for Motorola's 802.11" standard-essential patents. ER1629-33.

Motorola's claim that there "was no evidence" about the relative value or technical comparability of Motorola's patents to those in the pools (Br. 29) again ignores the record. First, these patents are indisputably comparable in a key respect: all were declared essential to the same technical standards. Second, while there was evidence that patents in the H.264 pool covered "significant and important technology," ER1616, Motorola offered no evidence that its patents were any more valuable than those in the pools, ER1623, ER1637. To the contrary, the court found that Motorola's patents provided only minimal contributions. ER1624, ER1638.

Further, the court did not simply apply the pool royalty to Motorola's H.264 patents; it found that the RAND royalty for Motorola's patents was substantially higher. Despite finding the pool royalty of 0.185 cents per unit a strong indicator of a RAND royalty for Motorola's H.264 patents, the court noted Motorola would receive that amount only if it were a pool participant—and because it was *not* a participant, the

40

court presumed Motorola was *not* receiving value back from the pool (in the form of licenses to other members' patents). ER1616-20. To compensate, the court set the RAND royalties for Motorola's patents at three times what Motorola would have received as a pool participant. ER1621. Motorola had a full and fair opportunity to argue for an even greater increase over the pool royalty. Instead, Motorola steadfastly insisted that pool royalties be rejected out-of-hand. SER50, SER55-58.

Motorola argues that the court failed to follow the Patent Act's requirement "that a reasonable royalty compensate for infringing use," (Br. 29), but this is not an infringement case, and the Patent Act does not govern the determination of a contractual RAND royalty. As the district court explained, RAND royalties are fundamentally informed by the goals of encouraging widespread adoption of standards and preventing hold-up and royalty stacking. ER1475-76. For example, RAND requires non-discriminatory royalties, but patent damages law endorses discriminatory royalties—in particular, the *Georgia-Pacific* construct contemplates higher royalty damages for a competitor. ER1486. RAND also requires consideration of the effect on the

41

standard of aggregate RAND royalties imposed on standard-compliant products.  ER1489-90.

Finally, while criticizing pool royalties (and the court's "formula" used as part of its analysis of those royalties), Motorola ignores the other evidence, including Motorola-specific evidence, on which the court relied.  As to H.264, Motorola ignores its extensive history of pool participation, including its influence on and approval of pool royalties.  Moreover, as explained above, the court's "formula" only increased the RAND royalty over the royalty suggested by this comparable.  As to 802.11, the court considered evidence independent of the 6-cent-per-unit royalty suggested by the Via pool.  The court analyzed evidence concerning licensing in the 802.11 chip industry, which suggested a RAND royalty of 3-4 cents.  ER1639-43.  The court also considered Motorola's InteCap valuation, suggesting even lower RAND royalties of 0.8 to 1.6 cents per unit. ER1644-51.  In the end, the court took the average of these indicators, ER1652-53—the Via pool royalty Motorola wishes to discard being the most favorable to Motorola.

### III. Overwhelming Evidence Supports the Jury's Finding of Breach.

#### A. Motorola Forfeited Any Claim of Insufficient Evidence of Breach of Contract.

Motorola's arguments are directed solely at the breach of its duty of good faith and fair dealing. Contrary to Motorola's assertion (Br. 20), Microsoft also alleged that Motorola breached the contract directly, and the jury was instructed on direct breach. ER59:25-63:18, ER65:22-66:18, SER17-21. Motorola did not move for JMOL on this ground (and does not argue it here) so this Court cannot review the sufficiency of the evidence supporting a finding of direct breach. The judgment should be affirmed on this ground alone. *See Nitco Holding Corp. v. Boujikian*, 491 F.3d 1086, 1088 (9th Cir. 2007).

Even if review were available, the evidence supported a conclusion of direct breach apart from the duty of good faith. The jury saw Motorola's multi-billion-dollar demands, ER1136, ER1158, and heard that Motorola maintained its demand for 2.25% royalties as late as December 2012, ER329(160:23-161:6), while still pursuing injunctions. That evidence alone supports a finding that Motorola failed "to make available and grant a license to its 802.11" patents on RAND terms, and

failed "to grant a license for its H.264" patents on RAND terms, as its

contracts required.  ER61:10-63:18; *see* ER45.

### B. The Good Faith and Fair Dealing Jury Instructions Were Correct.

Motorola's complaints about the "alone or in combination"

instruction are undermined by the authority it cites, which

demonstrates (correctly) that the covenant of good faith and fair dealing

may be breached through any of a variety of types of conduct.  (Br. 34.)

The cases do *not* set out a multi-factor test (in which all categories are

balanced together), but rather hold that proof of any ground may

demonstrate a breach.  *See Frank Coluccio Const. Co., Inc. v. King*

*County*, 150 P.3d 1147, 1155 (Wash. App. 2007) (conduct contrary to

parties' reasonable and justified expectations); *Aventa Learning, Inc. v.*

*K12, Inc.*, 830 F. Supp. 2d 1083, 1101 (W.D. Wash. 2011) (frustration of

purpose); *Craig v. Pillsbury Non-Qualified Pension Plan*, 458 F.3d 748,

752 (8th Cir. 2006) (Washington law) (commercially unreasonable

conduct); *Vylene*, 90 F.3d at 1477 (California law) (same); *Curtis v.*

*Northern Life Ins. Co.*, No. 61372-3-I, 2008 WL 4927365, *6-7 (Wash.

App. 2008) (non-precedential) (conduct contrary to industry custom and

practice); *Amerigraphics, Inc. v. Mercury Cas. Co.*, 107 Cal. Rptr. 3d

307, 321-23 (Cal. App. 2010) (California law) (same); *Scribner v. Worldcom, Inc.*, 249 F.3d 902, 910 (9th Cir. 2001) (Washington law) (unreasonable exercise of contractual discretion); *Craig*, 458 F.3d at 752 (same).

Motorola's argument that the instruction "shifted the burden to Motorola to disprove" each ground (Br. 35) makes no sense. Microsoft bore (and carried) the burden of proving that Motorola's conduct breached the duty on at least one ground. For example, if Motorola's conduct frustrated the purpose of the RAND commitment, the jury could find breach, regardless of industry custom and practice. Motorola cites no authority suggesting it should be excused if others customarily engaged in patent hold-up. To the contrary, Motorola concedes that the jury was entitled to "giv[e] such weight to each [of these grounds] as the jury finds appropriate." (Br. 35.)

As for any subjective inquiry into Motorola's own view of its conduct, the Washington law Motorola paraphrases holds only that "evidence of good or bad faith *may be* dispositive." (Br. 36, emphasis added.) That is consistent with the jury instruction, which stated that subjective evidence "need not dictate" the jury's conclusion. ER65:14-

45

16, SER23.  Nothing prevented the jury from considering all of the

evidence.  Further, Motorola's subjective evidence was not unrebutted.

The jury heard evidence that Motorola sent its demands in order to set

up injunctive actions.  ER268(124:15)-ER269(126:11), ER372(107:16-

19).  The jury also heard that Motorola's outsized demands did *not*

reflect a "standard" offer for 802.11 and H.264 patents.  ER256(77:15)-

ER257(79:20).

Finally, the injunction instruction itself contradicts Motorola's

claim that the court "nowhere specified the 'circumstances'" in which

pursuit of injunctions could breach the duty of good faith.  (Br. 37.)  The

court told the jury to apply the standard of Instruction 16 (setting out

the categories of conduct that can be breaches) when considering

Motorola's pursuit of injunctions.  ER71:5-12, SER29.  The court's

earlier summary judgment ruling on injunctions (Br. 37, citing ER565)

does not help Motorola.  The jury was *explicitly instructed* that "the

RAND commitment does not by itself bar standards-essential patent

owners from ever, in any circumstances, seeking injunctive relief."

ER71:1-3, SER29.  That instruction is wholly consistent with the

Federal Circuit's consideration of the availability of injunctions on

standard-essential patents in Motorola's suit against Apple. *See Apple, Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1321-22 (Fed. Cir. 2014); *id.* at 1342-43 (Prost, J., concurring-in-part).

### C. The Evidence Supports the Jury's Multiple Findings of Breach.

#### 1. The Evidence Supports a Finding That Motorola's Entire Course of Conduct Breached its Duty of Good Faith and Fair Dealing.

Motorola examines its royalty demands piecemeal and its pursuit of injunctions in isolation. (*See* Br. 37-40.) But the evidence showed that Motorola's "entire course of conduct" was "much more consistent with them seeking to hold up Microsoft" in frustration of the purpose of the contracts. ER388(173:22)-ER389(174:19). The jury heard that Motorola's demands were commercially unreasonable, ER321(128:22-25), ER322(131:12-14), that Motorola's purported "RAND" offer was a "going-out-of-business model" for Microsoft's WiFi chip supplier, ER312(93:24)-ER313(94:6), that Windows or Xbox had never before been threatened with injunctions simply because they comply with standards, ER242(19:1-5), ER248(44:9-13), and that Motorola's conduct threatened the entire standards system, ER326(149:12)-ER327(150:5).

The jury saw Motorola's demands, heard that Motorola could have chosen to seek only damages (and not injunctions) in its lawsuits, ER270(132:2-16), learned that the district court and this Court stopped Motorola from pursuing its injunction in Germany, ER271(137:6-20), ER453(13:16)-ER454(15:10), and that Motorola nonetheless continued to seek injunctions knowing Microsoft would accept a license on RAND terms, ER453(11:8-12:8), ER454(15:11-18, 16:5-13).  That evidence amply supports a conclusion that Motorola's course of conduct reflects an unreasonable exercise of contractual discretion as a RAND-committed standard-essential patent holder.

> ## 2. The Evidence Supports a Finding That Motorola's October 2010 Demands Breached its Duty of Good Faith and Fair Dealing.

The evidence with respect to the five objective inquiries under the duty of good faith and fair dealing supports a finding that Motorola's demands breached that duty.  Motorola's argument on industry custom and practice fails.  Motorola presents only cursory arguments as to three other inquiries, arguments it waived by not presenting them below and which are unavailing in any event.  Motorola ignores the fifth

inquiry (unreasonable exercise of discretion), which by itself is a sufficient basis for affirmance.

**Custom and Practice:** The record refutes Motorola's assertion that its demands reflected a "standard offer" or ordinary practice of initiating negotiations. (Br. 36-39.) The October letters were *not* opening offers, but by their terms demands open for just 20 days that sought Microsoft's confirmation of acceptance. ER1136, ER1158, ER266(116:14-117:18). Further, the fact that negotiations may follow an opening offer does not imply that *any* opening offer, whatever its terms, is customary. For offers to license standard-essential patents, Microsoft's Horacio Gutierrez expected "a RAND rate or something close to a RAND rate." ER360(61:5-8). Finally, the jury was instructed (without objection) that Microsoft had no obligation to negotiate in response to Motorola's demands. ER71:13-18, SER30. Motorola cannot dodge that instruction by claiming it would have been "customary" for Microsoft to do so.

In any event, the evidence demonstrated that Motorola's conduct was not "customary." ER242(18:2-19:5), ER247(41:12-15); ER320(123:13-24), ER319(120:12-121:23), ER431(160:7-161:9).

Microsoft's 802.11 chip supplier testified that 1% of chip price is a customary ceiling for royalties, but Motorola's 2.25% of end-product price (which Motorola sought from both Microsoft and the chip supplier) exceeded 100% of chip price. ER312(92:15)-ER313(94:6). A licensing structure based on the prices of end products made by Microsoft's PC manufacturing customers is facially impossible for Microsoft to accept. ER242(18:16-25), ER243(22:9-12), ER320(123:1-24).

Motorola's conduct did not even conform to its own prior practice. Kirk Dailey (Motorola's head of licensing) was unaware of any Motorola licensee paying a royalty based on the selling price of a product sold by the licensee's customer, as Motorola demanded of Microsoft. ER254(69:25)-ER255(70:12). Further, Motorola's InteCap valuation proposed royalties far lower than Motorola's 802.11 demand. ER386(164:15-165:10), ER387(166:4-13). The H.264 pool (including thousands of patents from dozens of companies, ER325(144:20-145:9)), indicates customary practice for H.264 licensing, and Motorola endorsed its royalties. ER306(69:25)-ER307(71:3), ER307(72:19)-ER308(76:2). Yet Motorola's demand for its own patents dwarfed the pool royalties covering use of *all* of the pooled patents. ER386(162:8-17).

**Frustration of Purpose:**  The record contains substantial evidence that Motorola engaged in hold-up in frustration of the contracts' purpose.  Hold-up was defined for the jury as "the ability of a standards-essential patent holder to demand more than the value of its patented technology."  ER66:23-ER67:2, SER25.  Motorola's patents represent only a sliver of the technology incorporated into H.264 and 802.11, ER384(156:15-19), ER385(158:12-17), and the jury was instructed that the RAND royalties for Motorola's patents were 0.555 and 3.471 cents per unit, respectively, ER69:7-18, SER28.  Motorola demanded vastly more, seeking royalties of $11.25 and up per unit for H.264, ER255(71:9-11), and as much as $9 per unit for 802.11, ER256(74:17-25).

Moreover, the jury heard expert testimony that Motorola's demands were consistent with a hold-up strategy.  ER380(138:12)-ER381(145:16).  Motorola confirmed that its policy was to make a demand before seeking injunctions on standard-essential patents, ER268(125:23)-ER269(126:11), ER372(107:16-19), and conceded it was preparing its injunction suits even as it sent the October letters, ER268(123:18-23, 124:15-125:7).  Motorola's immediate pursuit of

injunctions confirms that its demands sought to use the patents for hold-up. ER382(146:3-147:10). Motorola's effort to secure a royalty-free grant-back of Microsoft patents *not* essential to those standards was consistent with hold-up, ER379(135:18-136:19), as was "negotiating" while threatening an injunction, ER387(169:18)-ER388(170:17). Motorola's sole argument is that Microsoft's expert declined to conclude as a factual matter that Motorola "intended" to engage in hold-up (Br. 38)—but that was for the jury to decide.

Motorola ignores another key purpose of the RAND commitment: preventing royalty stacking. ER67:2-4. Motorola's demands failed to account for the dozens of other patent holders, ER372(108:10-109:20), even though the stacking implications were obvious, ER385(160:9-20, 161:3-11). If those entities each demanded 2.25%, as Motorola did, the aggregate royalties would far exceed the prices of standard-compliant products. Because Motorola's patents reflect only minimal contributions, ER385(158:10-17), ER384(156:14-19), the aggregate royalty burden suggested by Motorola's demands is even more unreasonable—especially because Microsoft's products comply with

many other standards, ER241(16:17-22), ER247(39:19-22); ER321(128:3-21).

**Commercially Unreasonable:** Motorola claims that its demands "cannot be commercially unreasonable as a matter of law." (Br. 38.) That is wrong (*see Vylene*, 90 F.3d at 1477 and *Best*, 739 P.2d at 559, *supra*), and is also contrary to Motorola's concession in the district court that "blatantly unreasonable offers would violate its RAND obligations." SER98. *See W.L. Gore & Assoc., Inc. v. Carlisle Corp.*, 529 F.2d 614, 623 (3d Cir. 1976) ("A royalty demand which is so high as to preclude acceptance of a license offer is, after all, not appreciably different from a refusal to license upon any terms.").

The evidence was overwhelming that Motorola's demands were in fact blatantly—*i.e.*, commercially—unreasonable. Motorola's H.264 demand of 2.25% on end-product price ranged from $4.50 per unit for the cheapest Xbox, to $22.50 per unit for a $1000 computer running Windows—but the RAND royalty is 0.555 cents for each Xbox or copy of Windows. Motorola's 802.11 demand equates to $4.50 per unit or higher for the Xbox, but the RAND royalty is 3.471 cents per Xbox. The determined RAND royalties strongly suggested that Motorola's

demands were not just high, but commercially outrageous.
ER380(139:12-140:2), ER381(142:6-19), ER321(128:22-25),
ER322(131:12-14).

Motorola's own licensing practices confirm as much. Motorola had
never received royalties of the kind it demanded from Microsoft for
Motorola's H.264 or 802.11 patents alone. ER257(79:7-13). The
royalties Motorola sought for cellular patents shed no light on an
appropriate royalty for its insubstantial 802.11 or H.264 patents,
ER387(166:20-168:3, 168:23-169:8), as even Motorola's expert admitted,
ER489(154:14-19). Motorola admitted that if all owners of 802.11 and
H.264 standard-essential patents charged a 2.25% royalty on end
products, implementing the standards would not be viable.
ER372(108:10)-ER373(110:1), ER260(92:11-14). And Motorola had no
basis for believing that its 802.11 and H.264 patents were any more
valuable than those other essential patents. ER260(90:4-8, 91:13-19).

Critically, contrary to Motorola's assertion (Br. 38), this evidence
was available to Motorola when it made its demands. Motorola was
well aware of the pool royalties, and knew its demands were out of line.
ER266(115:9-18, 116:3-10), ER372(109:1)-ER373(111:5). No prior

Motorola license based a royalty on the price of products sold by the licensee's customers, as Motorola's H.264 demand did. ER254(69:25)-ER255(70:9). Indeed, Motorola's InteCap valuation suggested 0.5% of 802.11 chipset price, for chipsets used in end products, as a RAND royalty. ER386(164:2-12). But Motorola's 802.11 demand for the Xbox was over 100% of chip price. ER311(87:1-3). Motorola demanded $4.50 and up per Xbox; InteCap suggested 2 cents, which confirms that Motorola's demand was commercially unreasonable. ER386(164:15-165:1).

**Reasonable and Justified Expectations:** Substantial evidence demonstrates that Motorola's demands were contrary to the parties' reasonable and justified expectations. Gutierrez testified that while Microsoft recognized the possibility of assertions and counter-assertions of non-standard-essential patents, ER335(183:24-184:16), Microsoft expected that a RAND-committed company would offer RAND terms, ER360(61:5-8). Microsoft's witnesses explained that the expectation that RAND licenses would be available was critical for product design decisions. ER241(16:25)-ER242(18:1), ER247(40:15-22), ER426(141:4)-ER427(143:9).

Motorola knew that the "reasonable" component of RAND imposed a limit on what it could demand, and that it had to make licenses available on RAND terms. ER372(108:7-9), ER253(63:3-6, 63:22-24). In fact, Motorola had committed from the outset to license its 802.11 patents at "nominal competitive costs." ER1469-70, ER474(97:6-19), SER108.

**Unreasonable Exercise of Discretion:** The RAND licensing contracts vested Motorola with discretion in formulating licensing offers, and substantial evidence shows that Motorola exercised that discretion unreasonably. Motorola failed to move for JMOL on this ground, and fails to argue it on appeal, simply asserting without explanation that it "is irrelevant." (Br. 39 n.9.) It is not.

Motorola knew about the pool royalties (having blessed them as reasonable) and the InteCap valuation, yet ignored them in formulating its demands. Dailey acknowledged that 2.25% of the annual Windows-based computer market amounted to around $4 billion, knew that billions of dollars of Xbox consoles were sold every year, and was aware of Xbox and Windows revenues. ER255(71:15)-ER256(73:20). Yet Motorola still demanded 2.25%. Further, as to PCs and smart phones,

56

Motorola knew that Microsoft made component software and that Microsoft's customers sold the end products. ER254(68:22-69:10), ER256(75:9-12). Using the end product as the royalty base in light of that knowledge was unreasonable.

**<u>Subjective Bad Faith:</u>** Ample evidence indicated that Motorola did all of this in bad faith. Motorola urged its good faith because it had sought 2.25% in prior agreements. (Br. 50.) But in October 2010, Motorola knew its 802.11 and H.264 patents had never been licensed on a standalone basis, and had only been included in cross-licenses dominated, in terms of value, by Motorola's cellular patents. ER256(77:15)-ER257(78:6), ER259(87:22-88:2). Dailey felt that Motorola had a strong position with respect to cellular patents (relative to other cellular standard-essential patent holders), ER258(82:6-8), but had no reason to believe that Motorola's 802.11 or H.264 patents were any more valuable than those of dozens of other companies. ER260(90:4-8, 91:13-19).

Motorola's disregard of known RAND royalty benchmarks also supports a finding of bad faith. Dailey admitted pool royalties could inform RAND royalties, but decided they were somehow "different" from

57

Motorola's demand to Microsoft. ER266(116:3-13). Dailey's claimed ignorance of Motorola's InteCap valuation at the time he sent the letters, ER265(112:18-113:12), is irrelevant because he personally learned of the InteCap valuation by July 2012, yet did not offer Microsoft a royalty consistent with what he learned, ER266(114:10-22), confirming Motorola's intent from the outset.

Motorola's cursory argument that Dailey expected Microsoft to respond (Br. 39) goes nowhere. It defies common sense to suggest that a party bound by a RAND licensing obligation may use the prospect of future negotiations to justify knowingly making excessive, non-RAND demands. Even Dailey admitted it was incumbent on Motorola to make its patents available on RAND terms. ER253(63:3-6). The jury was entitled to reject any suggestion that Motorola intended its demands as placeholders, not proposals of actual RAND royalties, because the letters expressly state that the offered royalties are "RAND." ER1136, ER1158. Motorola knew its offers could not be accepted but made them anyway. ER267(118:4-7), ER283(185:5-11).

Dailey was well aware of the demands' financial implications. ER255(71:9-73:9), ER256(74:17-75:18), ER262(100:9-14). Dailey's team

58

had investigated how Motorola's patents and the standards applied to Microsoft's products.  ER262(98:5-101:9).  Microsoft's use was obvious: Xbox is a game console, with 802.11 available as an alternative means of connecting to the Internet.  ER246(36:2-9), ER247(38:22-39:8).  In Windows, the ability to display H.264-encoded video is only one of thousands of operating-system features.  ER240(13:21)-ER241(15:10). Motorola needed nothing more to ascertain that the royalties it demanded were not remotely reasonable.  ER322(133:17)-ER323(134:1)

Finally, Motorola's later conduct confirms its intent in October 2010.  Dailey refused to include the 802.11 and H.264 patents in the parties' licensing discussions in late 2010.  ER327(152:20-153:16).  Even after the November 2012 bench trial, Motorola continued to demand a 2.25% royalty.  ER388(171:1-5); ER329(160:23-161:6).

### 3. The Evidence Is Legally Sufficient to Find That Motorola Breached By Pursuing Injunctions.

Motorola makes three attempts to argue that pursuing injunctions was not a breach of the duty of good faith and fair dealing.  First, Motorola blames Microsoft for asserting unrelated patents against Motorola in earlier litigation (Br. 39), but that has nothing to do with whether Motorola's conduct breached its RAND licensing commitments.

59

Second, Motorola suggests its behavior is excused by "Microsoft's continued unlicensed use of [Motorola's] patents." (Br. 40.) But Microsoft's products were "unlicensed" because of *Motorola's* refusal to grant RAND licenses. Microsoft made clear that it was willing to take a reasonable license to Motorola's patents in early October 2010. ER331(167:21-168:7). Microsoft confirmed this willingness in its complaint, which sought an accounting of RAND terms for Motorola's patents. ER360(58:23-17), ER448(228:1-14). Microsoft made clear that despite uncertainties over the validity and essentiality of Motorola's patents, it would accept a license to resolve the issue. ER359(57:15)-ER360(58:14), ER461(45:15-23). And Microsoft further committed in writing in September 2011 to take a RAND license. ER453(10:17-11:14). As the jury heard, *Motorola continued seeking injunctions through January 2013.* ER454(17:13-23).

From November 2010 on, and certainly from September 2011 on, Motorola's only purpose for seeking injunctions was to pressure Microsoft to settle on supra-RAND terms. If Motorola truly wanted a RAND royalty, it could have obtained one through this lawsuit and had no need to seek an injunction. ER270(132:8-16), ER412(84:1-7).

Further, Motorola had no reason to take its standard-essential patents to the ITC, because the ITC cannot award RAND royalties or any other form of monetary relief. ER459(36:2-10).

Third, Motorola misconstrues a June 2011 letter from Microsoft to the FTC as supporting Motorola's view of injunctions and hold-up. (Br. 40.) The jury heard from the letter's author, David Heiner, and from an expert economist that Motorola's interpretation of the letter was incorrect. ER427(145:17)-ER428(147:25), ER410(76:18)-ER411(78:17). Motorola mischaracterizes Heiner's testimony, which did not mention injunctions at all. ER436(178:19-179:18).

As with its arguments concerning the October 2010 demands, Motorola failed below to address four of the five objective grounds concerning its pursuit of injunctions, each of which supports affirmance. The only ground Motorola addressed was frustration of purpose. None of its arguments on appeal shows any error.

**Frustration of Purpose:** The jury had ample evidence to conclude that injunctions were part of Motorola's hold-up strategy: Motorola backed unreasonable royalty demands by pursuing injunctions around the world. ER376(125:11)-ER377(127:2), ER328(154:24-155:23,

61

156:9-16). In light of the timing of those actions, the jury could reject Motorola's suggestion that it sued as a response to Microsoft's contract suit: Motorola filed two suits the day after Microsoft filed this case, and another only 12 days later. The jury heard Motorola's policy of making demands before seeking injunctions on standard-essential patents, and that Motorola prepared its complaints seeking injunctions at the same time it made its October 2010 demands.

If granted, the injunctions would have left Microsoft with a choice between pulling its standard-compliant products out of the U.S. and German markets, or somehow removing the "sliver" of standard-compliant functionality tied to Motorola's technology, which (despite the minor importance of Motorola's patents) would render those products non-compliant with the standards. ER327(151:1-152:10). The threat of injunctions is key leverage in forcing implementers to accept non-RAND terms. ER376(125:11)-ER377(127:2). Motorola continued to seek an ITC exclusion order on H.264 patents until January 2013. ER454(17:19-21).

**Commercially Unreasonable, Custom and Practice, and Unreasonable Exercise of Discretion:** Even if the pursuit of

injunctions on standard-essential patents were considered reasonable or customary before 2012 (and there is no evidence that it was), the FTC's public interest statement to the ITC, ER429(150:23-151:17), establishes that regulators viewed that conduct as unreasonable, contrary to the public interest, and a "custom and practice" (if it ever existed) that should be abandoned. Further, Motorola's decision to pursue injunctions was so far from commercially reasonable conduct, or a reasonable exercise of its discretion as a standard-essential patent holder, that it prompted regulatory oversight, as demonstrated by the FTC's 2012 investigation of Motorola's conduct. ER428(149:17-25).

**Reasonable and Justified Expectations:** Gutierrez's testimony establishes that Microsoft's reasonable and justified expectations were that no company with RAND licensing commitments would use standard-essential patents as Motorola did. ER326(149:13)-ER327(150:5), ER360(61:9-13). Even Motorola knew it should not use its standard-essential patents to force concessions on non-standard-essential patents. ER373(111:6-112:6). And by June 2012, Motorola knew its conduct was the subject of FTC scrutiny. ER429(150:23-

153:6). Motorola could not have had any expectation that pursuing

injunctions on standard-essential patents was acceptable.

**Subjective Bad Faith:** Substantial evidence demonstrated that

Motorola pursued injunctions in bad faith—especially given Dailey's

admission that injunctions were unnecessary. ER270(132:2-16). This

suit put Motorola on notice that the RAND license dispute would be

resolved here, yet Motorola pursued injunctions elsewhere in an end-

run that ultimately required this Court's intervention. ER453(11:16)-

ER454(15:10).

### D. The Record Contains Substantial Evidence of Legally-Supported Damages.

#### 1. The *Noerr-Pennington* Doctrine Does Not Apply to This Breach of Contract Case.

Motorola cites no authority suggesting that *Noerr-Pennington*

could immunize it from breach of contract liability for seeking

injunctions on standard-essential patents. The only other court to

resolve this question held that *Noerr-Pennington* does not apply. *See*

*Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1078 (W.D.

Wis. 2012) ("It would be improper to use the *Noerr-Pennington* doctrine

to bar Apple from enforcing that contract."). *Cf. In re Innovatio IP*

*Ventures, LLC Patent Lit.*, 921 F. Supp. 2d 903, 922 n.17 (N.D. Ill. 2013) (noting that the parties—including Motorola Solutions, a defendant here—did not dispute that *Noerr-Pennington* was inapplicable to breach of RAND commitment claims).

Outside the RAND licensing context, courts have ruled that the "*Noerr-Pennington* doctrine does not shield [parties] from liability for failing to comply with [a] contract." *Powertech Tech., Inc. v. Tessera, Inc.*, 872 F. Supp. 2d 924, 932 (N.D. Cal. 2012); *ClearPlay, Inc. v. Nissim Corp.*, No. 07-81170-CIV, 2011 WL 6724156, at *10 (S.D. Fla. Dec. 21, 2011); *Spear Pharms., Inc. v. William Blair & Co., LLC*, 610 F. Supp. 2d 278, 288 (D. Del. 2009); *Bores v. Domino's Pizza LLC*, No. 05-2498, 2008 WL 4755834, at *4 (D. Minn. Oct. 27, 2008). None of the cases Motorola cites (Br. 41-42) applies *Noerr-Pennington* to a breach of contract.

Even if *Noerr-Pennington* applied, Motorola ignores that its conduct would still be actionable under the "sham litigation" exception. Motorola's suits were not "reasonably calculated to elicit a favorable outcome," *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 50, 60 (1993), because this action to enforce Motorola's

RAND licensing commitments had already been filed, giving Motorola a path to obtaining RAND royalties. Motorola's only hope for a "favorable" outcome would be that its suits outpaced this case, so that Motorola could leverage injunctions to hold-up Microsoft. Such use of "governmental *process*—as opposed to the *outcome* of that process"—is not protected by *Noerr-Pennington*. *Prof'l Real Estate Investors*, 508 U.S. at 60-61.

Finally, Motorola ignores that multiple instances of its conduct, including the October 2010 demands and its later pursuit of injunctions, breached its RAND licensing commitments. Even if Motorola were immune from suit for *filing* the infringement actions, the expenses Microsoft incurred defending those actions and Microsoft's relocation costs in Germany could still be recovered as damages for Motorola's *other* breaching conduct. Authority Motorola cites elsewhere confirms that where breaching conduct exposes a plaintiff to other litigation, fees incurred in that litigation can be recovered as damages. (*See* Br. 43-44.)

## 2. The Jury Awarded Damages Consistent with Washington Law.

Microsoft is entitled "(1) to recovery of all damages that accrue naturally from the breach, and (2) to be put into as good a pecuniary

position as [it] would have had if the contract had been performed."
*Eastlake Constr. Co., Inc. v. Hess*, 686 P.2d 465, 470 (Wash. 1984).
Microsoft's damages include injuries Motorola "had reason to foresee as
a probable result of [its] breach when the contract was made." *Dally v.
Isaacson*, 245 P.2d 200, 203 (Wash. 1952). Such injuries include both
the cost of relocating Microsoft's German facility, and fees Microsoft
incurred in defending against Motorola's injunctive actions.

Motorola ignores the former and argues only about the latter. But
this is not a case about the "American rule" (Br. 43), under which
attorneys' fees incurred in an action are generally not awarded as costs
or damages to a prevailing party *in that same action. See City of Seattle
v. McCready*, 931 P.2d 156, 160 (Wash. 1997). The damages awarded
*were not fees incurred in this contract action*, but those incurred in
defense of the injunctions Motorola sought. Those fees were foreseeable
and flow directly from Motorola's breach. At bottom, Motorola argues
that it should be immunized from damages because it breached by filing
lawsuits. Motorola is not free to impose litigation harms without facing
consequences.

67

The district court's conclusion that Washington law would recognize this form of damages was well-founded.[9]  Awards of fees as damages "are based on a determination [that] a wrongful act may leave another party with no choice but to litigate." *McCready*, 931 P.2d at 162.  Cases involving breaches of the duty of good faith and fair dealing are particularly appropriate for such damages.  "[A]ttorneys fees are a proper element of damages when the right violated is the right to be free from suit"; "[a]n implied right to be free from suit therefore stands on the same legal footing as a similar express right contained in a covenant not to sue." *Riveredge Associates v. Metro. Life Ins. Co.*, 774 F. Supp. 897, 901-02 (D.N.J. 1991); *see also Cohn v. Taco Bell Corp.*, No. 92-C-5852, 1995 WL 247996, *9 (N.D. Ill. April 24, 1995) (California law).

The jury heard unrebutted testimony that Motorola's injunctive actions caused Microsoft to incur the fees in question.  ER455(21:10)-

---

[9] *Gruver v. Midas Int'l Corp.*, 925 F.2d 280, 283-84 (9th Cir. 1991), does not "address that very question" (Br. 44), but instead concerns whether (under Oregon law) a party could recover as damages fees "incurred in enforcing [a] provision of a contract which did not provide for fees."  The fees portion of Microsoft's damages came from Motorola's patent suits—the fees were not incurred enforcing Motorola's contract in this case.

ER459(36:21). Dailey conceded it was unnecessary for Motorola to seek injunctions. ER270(132:2-16). This was sufficient for the jury to conclude that Microsoft's damages were caused by Motorola's conduct.

Even if the American rule controlled, its equitable exceptions support the jury's award. Washington law recognizes that even fees *in the same action* can be awarded as damages when fees are incurred as a direct consequence of the defendant's wrongful conduct. Courts routinely award fees for defending a lawsuit initiated in violation of a covenant not to sue. *See, e.g., Anchor Motor Freight, Inc. v. Int'l Broth. of Teamsters, Local Union No. 377*, 700 F.2d 1067, 1072 (6th Cir. 1983) (fees should be "used as a measure of the actual damages…incurred in defending against the lawsuit…instituted purportedly in violation of a covenant not to sue"). Motorola's claim that the court's analogy to such authority "lacked any legal or factual justification" ignores the court's analysis. The court reasoned that Washington courts (which had not yet ruled on the general question of fees as damages for violations of covenants not to sue) would recognize a *narrower* exception for suits (and pursuit of injunctions) on RAND-committed patents. ER36-39.

Washington recognizes other equitable exceptions as well, including awarding as damages fees incurred in procuring the dissolution of a wrongfully-issued injunction. *Cecil v. Dominy*, 418 P.2d 233, 234-35 (Wash. 1966); *Ino Ino, Inc. v. City of Bellevue*, 937 P.2d 154, 176 (Wash. 1997) (exception deters "seeking relief prior to a trial on the merits"). The jury found Motorola breached by seeking the leverage of an injunction in Germany, prior to a trial here that would determine a RAND royalty, E45-46, making Microsoft's fees incurred defending against Motorola's improperly-sought German injunction recoverable as damages.

### 3. The Evidence Established the Damage Element of Breach of Contract under Washington Law.

Finally, Motorola's argument that the evidence of damages was so deficient that it failed even to establish the minimal harm necessary to sustain a breach of contract claim (Br. 45-46) is wrong. First, even if one ignores the fees Microsoft incurred in defending against Motorola's injunctive efforts, Motorola's pursuit of an injunction in Germany forced the German relocation (*see* pp. 16-18, *supra*). That relocation caused Microsoft to incur costs that it would not have incurred absent Motorola's breach. Microsoft's expert presented those costs to the jury.

70

ER415(94:6)-ER420(116:8).  The jury explicitly found that Motorola

breached the contract by pursuing injunctions and awarded relocation

damages.  ER45-46.  Motorola does not challenge that determination on

appeal.  The relocation costs, standing alone, establish the requisite

damage.

Second, even if one ignores both the defense costs and the

relocation costs, nominal damages are sufficient to sustain Microsoft's

breach claim, and would be appropriate here because Microsoft sought

broad equitable relief.  *See Merrell v. Renier*, No. C06-404-JLR, 2006

WL 3337368, at *5-6 (W.D. Wash. Nov. 16, 2006).  The cases Motorola

cites disapproving of nominal damages when only monetary relief is

sought (Br. 45-46) thus do not apply.

## IV.  The District Court's Evidentiary Rulings Were Correct.

### A.  The Court's Rulings on FTC-Related Evidence Were Correct.

FTC-related evidence came in at Motorola's insistence, not

Microsoft's.  Motorola thus opened the door on the specific issue of FTC

scrutiny of RAND licensing commitments.  *See generally McCollough v.*

*Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939, 954 (9th Cir.

2011) (appellant opened the door through preemptive use of evidence at

71

trial before its introduction by the opposing party).  Motorola pressed for admission of a 2011 Microsoft-FTC letter, claiming it showed that "Microsoft had never, to that date, ever accused anyone of patent hold-up."  ER227(159:25-160:5).  Motorola told the jury that the "purpose" of Microsoft's letter was "to say [to the FTC] you don't have to worry about patent hold-up in the world.  It's not a real problem."  ER232(179:23-24).

In light of Motorola's arguments, Microsoft called the letter's author, David Heiner, to testify concerning Microsoft's interactions with the FTC, including both the letter and Microsoft's complaints about Motorola's conduct.  Motorola presented an "empty head, pure heart" defense, contending it was unaware that its conduct was inconsistent with its obligations.  ER284(186:1-16), ER286(194:19-195:2), ER286(197:3-24), ER287(198:20-199:1).  Evidence that the FTC had initiated an investigation of Motorola based on that same conduct undermined the credibility of that claim.[10]  The court warned Motorola

---

[10] Motorola relies on *Kramas v. Sec. Gas. & Oil Inc.*, 672 F.2d 766, 772 (9th Cir. 1982), but the evidence in that case was excluded under FRE 404(b), as evidence of *other* wrongful acts—inapplicable here where the conduct underlying the investigations is the same as the conduct now at issue—Motorola's pursuit of injunctions on standard-essential patents.

"[i]f you are putting on your good heart or clear-heart evidence, they are permitted to say, well, wasn't there an FTC investigation going on in which the subject was exactly this issue." ER424(130:7-10). The court admitted a redacted version of the letter, and permitted testimony concerning "the existence of [the FTC] investigation, but not the details of it." ER422(124:11-125:23).

Microsoft's counsel disclosed in advance (outside the presence of the jury) its questions for Heiner about the FTC investigation. ER424(132:18-133:14). Heiner then testified as to his understanding of the investigation, including a partial statement about its conclusion that Motorola flags on appeal. ER429(153:8)-ER430(154:2). Motorola objected, and the court twice instructed the jury to disregard Heiner's statement, explaining that the consent order was for settlement purposes, contained no admission of liability, and did not conclude that the facts alleged in the FTC complaint were true. ER430(154:4-6), ER431(158:23-159:13).

The court gave the jury "prompt and effective" instructions, *B.K.B.*, 276 F.3d at 1105, and the jury is presumed to have followed them, *United States v. Randall*, 162 F.3d 557, 559 (9th Cir. 1998). The

73

court's clear instruction was more than adequate to counter any hypothetical prejudice from Heiner's testimony. And Heiner's incomplete statement could not have prejudiced Motorola in light of the other evidence. *United States v. Johnson*, 618 F.2d 60, 62 (9th Cir. 1980). Motorola guaranteed the jury would learn of the existence of the FTC investigation by pressing for admission of the Microsoft-FTC letter. The other evidence of breach, unrelated to the FTC investigation, was overwhelming and fully supported the verdict. *See Johnson*, 618 F.2d at 62.

### B. The Court's RAND Findings Were Appropriately Used.

Motorola's argument that the use of the RAND royalty findings presents a timing concern (Br. 48-49), rests on a false premise. The RAND royalty determination was based not on "unknowable facts" (Br. 49), but on information fully available to Motorola in 2010—including Motorola's H.264 pool participation and the InteCap valuation.

Motorola gives one example of claimed "unknowable facts": the court's claim construction and invalidity rulings in a Motorola-filed patent case. (Br. 49.) But Motorola's claim that the court "incorporated those findings into the RAND Order" in this case (*id.*) is refuted by the

passage Motorola cites. At ER1504-16, the court discusses *only* the testimony of technical experts and Motorola's Ajay Luthra. The court makes no mention of any claim construction ruling or validity determination—in fact, the court notes that Motorola's witnesses' opinions "rest on the assumption that a court of law would construe the claim terms to cover a similar scope" as the witnesses did, yet "the court credit[ed] [their] testimony" and relied on it. ER1506-24. The court did not rely on prior rulings adverse to Motorola, as Motorola suggests—it followed the constructions Motorola's witnesses advocated.[11]

Especially because the underlying facts were known or available to Motorola in October 2010, the RAND royalty findings were relevant to the jury's task. Further, the jury's inquiry was not limited to Motorola's initial demands, but encompassed Motorola's ongoing conduct, including its demands and pursuit of injunctions *after* the 2012 RAND royalty trial.

Whether Motorola had to make opening offers on RAND terms does not matter; the jury rightly heard what were appropriate RAND

---

[11] Motorola's argument about the validity of its patents is also baseless. (Br. 49.) The court presumed that each of Motorola's patents was valid. ER1504-33, ER1555.

terms either way. (Br. 50.) Knowing the actual RAND royalty would plainly assist the jury in determining whether the offers were consistent with the duty of good faith. Whatever weight is given to the RAND royalty when evaluating breach, Motorola's claim that it "provides no assistance to the jury" (Br. 50) lacks substance.

Motorola's two claimed instances of "prejudice" (Br. 50-51) are unavailing. First, Dailey claimed he had a basis for demanding 2.25% royalties based on the RIM license. ER257(79:14-22). That license (*see* pp. 37-38, *supra*) was the subject of extensive testimony and findings at the RAND royalty trial, and the court correctly determined it did not inform a RAND royalty. The court permitted Motorola to offer testimony on the RIM license over Microsoft's objection, but warned it would instruct the jury that it was not an indicator of a RAND royalty. ER240(10:15-17). Motorola fails to explain how that balanced ruling was prejudicial.

Second, Motorola points to ER266, claiming its witnesses "were not permitted to contradict findings in the RAND Order," but it identifies no proffered testimony that was barred. Even if it had, Motorola fails to explain why it would have been "prejudicial" for the

76

court to bar Motorola's witnesses from contradicting findings from a trial to which Motorola consented and in which it fully participated. In effect, Motorola sought to retry the RAND royalty bench trial before the jury. The court's refusal to permit that tactic was correct. Motorola's complaint that the RAND trial findings carried "undue weight" (Br. 51) not only ignores Motorola's consent, but also ignores the court's careful restriction on their use. ER109-110.

In claiming that the court's waiver decision is "in error" because "there was no such waiver," Motorola points only to its later-filed, backpedaling motion, ignoring its consent (*see* pp. 28-29, *supra*) and the court's ruling. (Br. 51-53.) The court considered in detail the use of factual findings beyond the numerical RAND royalties. ER100-10. The court addressed Motorola's prior representations, ER103-05; that Motorola participated fully and had "urg[ed] the court to decide the very facts it now seeks to exclude," ER106; the parties' decision to leave the complex findings necessary to determine RAND royalties to the court, ER107; and that the court had intentionally avoided any issues close to the province of the jury, ER108.

77

The court observed that Motorola's position—keeping out all RAND trial findings—would allow Motorola "to argue the value of its patents to the judge, and then if the judge disagreed with them, Motorola could simply ask the jury to reach a different result." ER108. Apparently, Motorola believes it should have been permitted to do just that: Motorola complains that Microsoft's experts were permitted to treat as undisputed that Motorola's H.264 patents were of minor importance, and Motorola wished to (but could not) "question" those findings. (Br. 53.) Motorola attempted to establish the importance of its patents at the bench trial and failed as a factual matter. Motorola cannot explain why it should have been permitted to re-argue that issue before the jury.

Finally, Motorola cannot show prejudice from the use of the RAND royalty findings because the jury explicitly found that Motorola's conduct in seeking injunctions was a breach, a conclusion independent of the court-determined RAND royalties. ER46.

## CONCLUSION

For the forgoing reasons, the judgment below should be affirmed.

DATED:    Washington, DC     SIDLEY AUSTIN LLP
              November 14, 2014.

                    By:  s/ Carter G. Phillips
                        Carter G. Phillips
                        SIDLEY AUSTIN LLP
                        1501 K Street, N.W.
                        Washington, D.C. 20005
                        202-736-8000

T. Andrew Culbert           David T. Pritikin
MICROSOFT CORPORATION  Constantine L. Trela, Jr.
1 Microsoft Way             Richard A. Cederoth
Redmond, WA 98052         Robert N. Hochman
(425) 882-8080              Nathaniel C. Love
                        SIDLEY AUSTIN LLP
                        One South Dearborn
                        Chicago, IL 60603
                        (312) 853-7000

                        Arthur W. Harrigan, Jr.
                        Shane P. Cramer
                        CALFO HARRIGAN LEYH
                         & EAKES LLP
                        999 Third Avenue
                        Suite 4400
                        Seattle, Washington 98104
                        (206) 623-1700

## REQUEST FOR ORAL ARGUMENT

Plaintiff-Appellee respectfully requests that this Court hear oral argument in this case.

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Plaintiff-Appellee states that it is not aware of any related cases pending in this Court.

## CERTIFICATE OF COMPLIANCE WITH
## FRAP 32(A)(7)(C) & CIRCUIT RULE 32-1

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 32-1, the

attached answering brief is proportionally spaced, has a typeface of 14

points or more, and contains 13,976 words.

s/ Carter G. Phillips
*Counsel for Plaintiff-Appellee*
November 14, 2014

## CERTIFICATE OF SERVICE

I, Carter G. Phillips, a member of the Bar of this Court, hereby certify that on November 14, 2014, I electronically filed the foregoing "Brief Of Plaintiff-Appellee" with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I further certify that I caused one copy of Plaintiff-Appellee's Supplemental Excerpts of Record to be served by third-party carrier Federal Express by overnight delivery to the following counsel for Defendants-Appellants:

Kathleen M. Sullivan
Brian C. Cannon

s/ Carter G. Phillips
*Counsel for Plaintiff-Appellee*